## HENRIETTA ALLEN v. M. A. BAKER.

*Breach of Promise to marry—Evidence—Damages—Practice.*

1. An action for damages for breach of promise to marry does not abate upon the death of the defendant.

2. Contracts of this character differ from ordinary contracts, and upon a trial for breach of same, *it was held;* 1. All the circumstances of the case, and the surroundings of the parties, should be submitted to the jury. 2. Evidence of the value of the defendant's estate, and of the mortification and pain of mind the plaintiff suffered from his refusal to fulfil his promise, is competent to be considered by the jury as a standard by which to measure the plaintiff's disappointment and the extent of her loss.

3. Where defendant failed to perform such contract upon the ground that he was afflicted with a disease which rendered him unfit for the married state, *it was held* that he would be answerable in damages if the disease was contracted subsequently to the time of making the promise, or if before, and he knew his infirmity was incurable; but if it was contracted prior to the promise and he had reason to believe it was temporary only, he is excusable for a breach resulting from a knowledge afterwards acquired that it was of long duration.

4. Where the issues submitted do not cover the whole merits of a case,

this court will retain the cause and frame other issues to be passed upon by the jury in the court below.

(*Shuler* v. *Millsaps*, 71 N. C., 297; *Barnes* v. *Brown*, 69 N. C., 439, cited and approved.)

CIVIL ACTION tried at Fall Term, 1881, of WAYNE Superior Court, before *Shipp, J.*

This action in which the plaintiff complains that J. B. Baker, the defendant's intestate, was guilty of a breach of a contract of marriage with herself, was begun in the lifetime of the intestate. He died after filing his answer, and the defendant as his administrator was made a party. It was insisted for the defendant that the action abated upon the death of his intestate, but His Honor held otherwise, and directed the trial to proceed, to which the defendant excepted.

The plaintiff alleged that the said Baker on the 13th of February, 1875, contracted to marry her, and the said contract was to be consummated according to the agreement of the parties on the 14th of March following, with which agreement he refused to comply.

The said Baker in his answer admitted that there was an indefinite agreement between the plaintiff and himself to marry, but that no definite time was agreed on, and that a very few days after entering into said agreement, he was advised by his physician that he was so diseased as to be unfit to marry, which fact he immediately communicated to the parents of the plaintiff, and asked that the marriage might be postponed until his recovery, to which they assented. He further alleged that he was still diseased at the time of filing his answer, and that at no time since making his contract with plaintiff, had he been in a condition to marry.

On the trial, after offering testimony tending to prove that there was a contract of marriage between defendant's intestate and herself, and his refusal to comply therewith, the plaintiff proposed to show by her father the effect pro-

duced upon her by such refusal. This evidence was objected to by the defendant, but admitted by the court, and the defendant excepted.

The plaintiff then offered in evidence the value of the estate of said intestate, to which objection was also made, but the court admitted it and the defendant excepted.

The defendant then introduced as a witness the attending physician of his intestate, who testified that he was greatly diseased with a venereal affection; that such was his condition at the time of the alleged contract of marriage, and that at no time thereafter, up to the day of his death, was he relieved.

The defendant's counsel asked that the following instructions should be given to the jury, to wit: That if the intestate was unable to perform the contract on the day appointed, and assigned no reasonable cause therefor, he was entitled to a reasonable time within which to perform it. 2. If during a necessary delay, the performance of a personal contract is rendered impossible by unforeseen circumstances, such as the death of the party, then his estate is not responsible.

His Honor, without making any express reference to the instructions prayed for, charged the jury that if they were satisfied that a contract of marriage was entered into between the parties, and the defendant refused to perform the same, the plaintiff would be entitled to compensation; that this contract was of a peculiar nature and no certain rule could be given whereby to estimate plaintiff's damages, but they should consider all the facts and circumstances of the case—though they would not be justified in awarding vindictive damages; that in mitigation of damages, they had a right to take into consideration the testimony as to the health and condition of the deceased at the time of the engagement, and his refusal to comply therewith, and if there was an agreement to postpone the marriage to some definite

time, and the intestate died before the time and was conse-
quently unable to perform the contract, then the plaintiff
would not be entitled to recover.

The issues submitted and the responses thereto were as
follows :   ·

1. Did defendant's intestate promise to marry plaintiff?
Yes.

2. Did plaintiff consent that the marriage should be post-
poned, on account of the disease of defendant's intestate, un-
til his recovery?   No.

8. Did the intestate refuse to marry plaintiff?   Yes.

4 What damages did plaintiff sustain?   Two thousand
dollars.

After judgment for the plaintiff, the defendant appealed.

*Messrs. Grainger & Bryan,* for plaintiff.
*Messrs. W. J. Clarke* and *Hinsdale & Devereux,* for defendant.

RUFFIN, J.  In *Shuler* v. *Millsaps,* 71 N. C. 297, the act of
1868–'69, (Bat. Rev. ch. 45 §§ 113, 114,) received a construc-
tion by this court, and it was held that by reason of the
provisions thereof, an action for a breach of promise of mar-
riage did not abate upon the death of the defendant, but
survived as against his personal representative.  We feel
ourselves bound by that decision, though were it an open
question, we are inclined to think we should hold differ-
ently, in a case like that and the present one, in which no
special damages were laid in the complaint.

As stated by His Honor, contracts of this sort differ from
ordinary contracts, as for the sale of goods and the like, in
which damages are awarded according to some well settled
rule of the courts, and when the financial condition of the
defendant can have no bearing on the question.  About the
only instruction that could be given was the general one
which His Honor did give, to the effect, that all the circum-

stances of the case and the surroundings of the parties
should be fairly considered, and just compensation allowed
for the anguish endured by the plaintiff, and the injury in-
flicted upon her prospects in life.   In estimating them, it is
proper, according to the great weight of modern authority,
that the jury should consider the pecuniary condition of
the defendant as some standard by which to measure her
disappointment, and the extent of her loss.   *Harrison* v.
*Swift*, 13 Allen, 144; *Sprague* v. *Craig*, 51 Ill., 288; Sedg-
wick on Damages, (7 Edition), 146.   The same authorities
are full to the point, that the jury should take into con-
sideration whatever mortification and pain of mind the
plaintiff may have suffered, resulting from a refusal of the
defendant to fulfil his promise.   So that, in the judgment
of this court no error was committed with reference, either
to the testimony admitted, or the instructions given to the
jury, of which the defendant can rightly complain.

We are of the opinion, however, that the issues which
were submitted do not cover the whole merits of the case,
and that without other findings on the part of the jury it
is impossible to do full justice to the rights of both parties.
Assuming it to be true, as we do from the verdict, that the
plaintiff did not give her assent to a postponement of the
marriage, and that the defendant's intestate refused to con-
summate it, it is still important to know from what cause
that refusal proceeded—whether from a disregard of the
plaintiff's feelings and his own plighted word, or from a
consciousness, supervening his engagement, that he labored
under a loathsome disease, incurable in fact, and of such a
nature as to render him unfit to enter the marriage relation
with any one.   In his answer he alleged that his failure to
comply really depended upon such a conviction on his part,
and if such be true, this court could not hold that he was
responsible in damages by reason thereof.   We cannot un-
derstand how one can be liable for not fulfilling a contract,

when the very performance thereof would in itself amount to a great crime, not only against the individual, but against society itself.

However once doubted, it is now generally conceded that if the performance of a contract be rendered impossible by the act of God alone, such fact will furnish a valid excuse for its non-performance; and such a stipulation will be understood to be an inherent part of every contract. It is likewise true, that whenever the main part of an executory contract becomes impossible of performance from any cause beyond the power of the party to control, it will be treated as having become impossible *in toto*. Why should not the same principle apply to a contract, the fulfilment of which, owing to causes subsequently intervening and altogether independent of any default of the party, can only be productive of consequences disastrous to the parties themselves, and such as may entail misery upon others to come after them?

Our attention was called by counsel to the decision made by the court of Queen's Bench, and afterwards by the court of Exchequer, in the case of *Hall* v. *Wright*, 96 Eng. C. L. Rep. 746, where a defendant was held liable, who, after promise and before breach, became afflicted with bleeding from the lungs, whereby he became incapable of marrying without imminent hazard to his life. In making that decision, the court treated a contract for marriage as they would any other contract, saying, that though in bad health, the man might nevertheless so far perform his contract as to marry the woman, and thus secure to her the status and social position of his wife, and endow her with a wife's interest in his estate; and if unwilling to do this, he should compensate her in damages for his refusal. We confess that we are not satisfied with this course of reasoning. In the first place, it is not possible to assimilate a contract like this to an ordinary contract for personal service, which, if not

capable of being wholly performed, may be partially so; and in the next place, we believe it to be contrary to the understanding of men generally, that the acquisition of property or social position, either does or should constitute a main and independent motive and inducement for entering into such a contract.

The usual, and we may say legitimate, objects sought to be attained by such agreements to marry, are, the comfort of association, the *consortium vitæ*, as it is called in the books; the gratification of the natural passions rendered lawful by the union of the parties; and the procreation of children. And if either party should thereafter become, by the act of God and without fault on his own part, unfit for such a relation and incapable of performing the duties incident thereto, then, the law will excuse a non-compliance with the promise—the main part of the contract having become impossible of performance, the whole will be considered to be so.

In Pollock on Contracts, 370, (a book in which the principles of contract are treated of more philosophically than by any author known to us) the decision in *Hall* v. *Wright, supra*, is referred to, with the remark, that it is so much against the tendency of the later cases as to be now of little or no authority, beyond the mere point of pleading decided therein.

We are not unmindful of the fact that the malady under which the party in this instance labored, was the legitimate result of his own imprudence; or, that the evidence offered showed that the disease was upon him, when he gave his promise to the plaintiff. As to the first point, the same might have been said of consumption, or any other fatal and disqualifying disease; it too may have proceeded from imprudent and sinful indulgence, but if contracted when he owed no duty to the plaintiff, we cannot see how that can vary the case. The other is a point of more conse-

7

quence; if knowing, or by using extraordinary diligence he might have known, that his infirmity was incurable, or of long duration, he entered into a contract with the plaintiff, his subsequent incapacity to perform it would furnish no excuse for its breach—so far from it, it would amount to a gross aggravation. But on the other hand, if he had reason to believe his disease was a temporary one, which might be healed in time to enable him to complete his agreement, then, the law would hold him excusable for a breach resulting from a knowledge subsequently attained, that his disease was in fact not only incurable, but such as must necessarily be communicated to his wife, and probably to their offspring, in case he made her such and availed himself of his conjugal rights.

The law will constrain no man to assume a position so full of peril, as to have placed within his reach the lawful means of gratifying a powerful passion, at the risk of another's health or life, and the possibility of bringing into the world children in whose constitution the seeds of a father's sin shall lurk. As said in the dissenting opinion in *Hall* v. *Wright*, it would seem to be strange that a man should be liable in damages for not doing that which is against all law, human and divine.

Under the rules, without sending the case back, and without depriving the plaintiff of the benefit of the verdict in her favor upon the issues already submitted, the court directs these further issues:

1. Did the defendant's intestate refuse to perform his contract of marriage with the plaintiff, because of his being so diseased as to be unfit for the married state?

2. Was he diseased at the time of making his agreement with the plaintiff; and if so, had he reason then to believe that his disease was permanent, or likely to be of long duration?

This course we pursue by virtue of the example set in *Barnes* v. *Brown*, 69 N. C., 439.

PER CURIAM.                              Judgment accordingly.