TRAMMELL v. VAUGHAN, Appellant.

Division One, November 12, 1900.

1. **Marriage Contract:** VENEREAL DISEASE: BREACH: DAMAGES.    The entering into a marriage contract by one who knows he has a loathsome, contagious, venereal disease, entitles the woman to refuse to marry him and treat his condition as a breach of the contract, as being a fraud perpetrated upon her, and is an aggravation of the damages she is entitled to recover for the injury done her by his unfulfilled promise of marriage.

2. ———: THE STATE A PARTY.    The State is a third party to every marriage contract, and has a direct interest therein.

3. ———: VENEREAL DISEASE: WHEN EXCUSES BREACH. It is legally, as well as morally, wrong for a man, while inflicted with a loathsome, contagious, venereal disease to marry, and for such cause he is entitled to demand a postponement of the marriage until he is cured.    And if he became afflicted with the disease without any fault, wrong or negligence on his part done after entering into the marriage contract, he can not be held for damages, but the contract is broken by force of law.    And whether or not the woman, after knowing his condition, expressed a willingness to marry him, or insisted on his doing so, is immaterial.

4. ———: ———: POSTPONEMENT.    In such case, if the disease is of a temporary character and can be easily cured, the man is entitled to postpone the marriage until he is cured, whether the woman consents to such postponement or not; if the disease is of a permanent character, the contract is abrogated.

Trammell v. Vaughan.

5. ———: ———: ———: PREMATURE ACTION. If the disease is curable and the man is from that reason entitled to postponement, the action is not prematurely brought, if before it is brought and before he is cured, his acts and declarations show he does not intend to perform the marriage engagement at any time.

6. ———: BREACH: DAMAGES: BREACH OF ANOTHER ENGAGEMENT. It is error to instruct the jury that if the woman was engaged to marry another, and defendant induced her to break such engagement to marry him, not intending in good faith to marry her, such conduct was an aggravation of her damages. She is not entitled to recover any damages growing out of her own wrongful act in breaking her promise to marry another.

7. ———: ———: ———: PUNITIVE AND EXEMPLARY. Exemplary or punitive damages, as such, can not be recovered for a breach of a marriage contract. The statement by defendant that he had induced the plaintiff to promise to marry him, had set the day, obtained a license, and then refused at the last hour, only to show other young men that he could marry her, is an aggravation of her damages, as are any other facts which show that the contract was fraudulently, maliciously or wantonly made, but they do not constitute a separate cause of action.

Appeal from Audrain Circuit Court.—*Hon. E. M. Hughes,* Judge.

REVERSED AND REMANDED.

*I. W. Boulware* and *D. H. Harris* for appellant.

(1) Marriage differs in many particulars from ordinary, general or commercial contracts. It is more than a mere civil contract—it is a matter of State concern, and the State is a party to the bargain which a man and woman make when they become husband and wife. And a contract to marry is assumed to be made for the purpose of mutual comfort and happiness. Blank v. Nohl, 112 Mo. 159; State v. Bittick, 103 Mo. 183; Dyer v. Brannock, 2 Mo. App. 432; Allen v. Baker, 86 N. Car. 91; Duntze v. Levett, Ferg. 385. (2) It

is implied as a part of every agreement to marry that any subsequent change in the mental or physical condition of either party without fault so as to render it impossible in the nature of things to accomplish the objects of the marriage relation, will release the parties from the agreement, at least for the time being.    Shackleford v. Hamilton, 93 Ky. 80; Mabin v. Webster, 129 Ind. 430; Walker v. Johnson, 6 Ind. App. 600; 2 Bishop on Marriage and Divorce, 582.    (3) If defendant contracted the disease prior to the date of his engagement to plaintiff—did not know then that he would be thus afflicted, but afterwards and before the day set for the ceremony discovered his diseased condition, this was a valid excuse for at least a postponement of the marriage until the result of the disease could be known or he be cured of same. Allen v. Baker, 86 N. Car. 91; Walters v. Stockberger, 50 N. E. Rep. 763; Sanders v. Coleman, 97 Va. 690; Boughner v. Boughner (Ky.), 41 S. W. Rep. 26; Venzke v. Venzke, 94 Cal. 225.    (4)   If he labors under a disease of such nature as to render him unfit to enter into the marriage relation with any one, he should be at liberty to refuse to perfrom the contract.    Allen v. Baker, 86 N. Car. 91; Shackleford v. Hamilton, 93 Ky. 80; Sanders v. Coleman, 97 Va. 690; Atchison v. Baker, 2 Peake's N. P. Cas. 103; Bishop on Marriage and Divorce, sec. 219; Pothier's "Traite du Mariage;" part 2, ch. 1, art. 61.    (5) Exemplary or punitive damages are allowable only when there is misconduct and malice, or what is equivalent thereto.    To open the door for such damages, the breach must appear wanton or malicious, or it must appear that the defendant unnecessarily wounded the feelings or injured the reputation of plaintiff; and this must appear from the pleadings.    Such damages can not be recovered unless specially pleaded.    Sutherland on Damages (2 Ed.), sec. 393, p. 847; Dupont v. McAdow, 6 Mont. 226; 3 Ency. of Plead. & Prac., p. 689.

*A. Finley* and *D. P. Bailey* for respondent.

(1) The petition sufficiently avers bad motive and wantonness in the whole transaction. The evidence clearly shows it, and, if so, plaintiff was certainly entitled to punitive damages. Thorn v. Knapp, 42 N. Y. 474; Southard v. Rexford, 6 Cowan 254; Grant v. Willey, 101 Mass. 356; Collidge v. Neat, 129 Mass. 146. (2) A disease of the kind set out in the answer was found by the jury to be curable in a reasonable time and the evidence shows it was cured in a month. If so it was no defense. If it had been incurable it might have been a defense. Sprague v. Craig, 51 Ill. 586. (3) This court will not disturb the finding unless it clearly appears that it was instigated by prejudice and passion. Wilbur v. Johnson, 58 Mo. 600; Douglass v. Gausman, 68 Ill. 170; Royal v. Smith, 40 Iowa 615. (4) The verdict of a jury in cases of this kind as to amount of damages will seldom be disturbed. Wilbur v. Johnson, 58 Mo. 600; Douglass v. Gausman, 68 Ill. 170; Denslow v. Van Horn, 16 Iowa 477; Royal v. Smith, 40 Iowa 615; Wilbur v. Johnson, affirmed, 116 Mo. 42. (5) In a case of this kind the jury may give examplary damages if the defendant's conduct has been wanton or malicious, or if he has unnecessarily wounded the feelings of plaintiff. Davis v. Slagle, 27 Mo. 600; Coryell v. Calbaugh, 1 N. J. L. 77; 1 Amer. Decis. 192.

MARSHALL, J.—The plaintiff sues the defendant for damages for breach of contract of marriage. The petition is in two counts. The first count alleges a contract of marriage entered into between the parties on December 4, 1896, to be performed at Hartsburg, Boone county, on December 6, 1896; the procuring of the necessary marriage license, by the defendant, from the recorder of Cole county; the public announcement of the contract; the meeting of the parties at

the appointed time and place; the willingness and offer of the plaintiff and the positive refusal of the defendant to carry out the contract; and asks five thousand dollars damages. The second count alleges that the defendant "willfully, falsely, fraudulently and maliciously induced plaintiff to enter into said marriage contract" for the purpose of humiliating and disgracing her in the public estimation and to prevent her marrying any one else, but with no intention of performing the contract himself, and asks five thousand dollars damages. The prayer of the petition is for five thousand dollars actual damages and five thousand dollars exemplary damages.

The answer is a general denial, and special pleas. The special pleas are: 1st, an admission of the contract, the procurement of the license, the meeting at Hartsburg and an inability to procure Rev. C. A. Mitchell to perform the ceremony; 2d, a postponement of the marriage by mutual consent to an unstated time, the continuance of the defendant's visits to plaintiff and the institution of this suit, eight days later, without notice to defendant of intention to sue, and without giving him any opportunity to carry out the contract; 3d, that when the contract was entered into the defendant believed himself to be well and physically in a proper condition to marry, but that after procuring the license and going to Hartsburg to carry out the contract, he discovered on the evening of December 5th that, without any fault, wrong or negligence on his part done after entering into the contract, he became afflicted with a loathsome, venereal and contageous disease, which rendered it unsafe, unwise, improper and morally wrong for him to marry the plaintiff at that time.

The reply is a general denial.

The facts developed at the trial were briefly these: The plaintiff and defendant had formerly been engaged for many years, but that engagement was cancelled about eighteen

months before, and the plaintiff had become engaged to one
Brown.   On December 4, 1896, the plaintiff and defendant
met at a spelling bee at the Dry Forks schoolhouse, about two
miles from her home.   They rode to her home together that
night, with the result that it was agreed that they should be
married the next Sunday (Dec. 6th) at the home of her
brother-in-law, Mr. Bush, in Hartsburg. Accordingly the next
morning the plaintiff started with her sister Dollie, and Dick
Foster, a young man who worked for plaintiff's family, for
Hartsburg, which was fifteen miles distant.   The defendant
overtook them and the plaintiff thereafter rode with him.
They reached Hartsburg about half past eleven o'clock a. m.
The defendant telegraphed for Rev. Mitchell, and then the
defendant and plaintiff's brother-in-law, Bush, went to Jef-
ferson City and procured the marriage license.   Upon their
return, a telegram awaited him saying Rev. Mitchell could
not come.   They discussed other ministers.   That evening
the defendant was sick, ate no supper and went to bed early.
The plaintiff and her sisters were engaged making her a wed-
ding dress.   During the night the defendant discovered, for
the first time, that he had the disease aforesaid.   The next
morning he kept his bed.   The plaintiff carried him a glass
of milk, which he drank.   He then told her he was too sick
to marry and was going home to see his doctor.   The plaintiff
insisted on marrying, and he finally told her she did not know
what was the matter with him but to send her brother-in-law,
Bush, into the room, and he would tell him and he could tell
his wife and she could tell plaintiff.   This was done.   Then
the brother-in-law, his wife, and the plaintiff returned to the
room, and the plaintiff insisted upon the marriage taking
place at once—said she would marry him as he was and he
could then go to St. Louis or some springs for treatment for
three weeks or a month and she could stay with her sister—
adding that she did not believe he was sick at all.   He

refused this proposition. That evening he drove to his home, a distance of some fifteen miles. The next morning her sister, Dollie, saw the defendant as she passed his house on her way home, and asked him when he was going to marry the plaintiff, and he replied he was not going to marry her at all. That day the defendant drove to Fulton, a distance of fifteen miles, and when congratulated upon his marriage, he said to several persons he was not married, did not intend to marry, only went to Hartsburg to show Alfred Longley, Bill Gibbs and Mr. Reynolds, who did not like him, or like plaintiff to associate with him, that he could marry the plaintiff if he chose.

On the next day, Tuesday, the defendant went to Hartsburg again to see the plaintiff. The evidence is conflicting as to whether on Sunday before he left her it was agreed to postpone the marriage until he got well. He says she did. In her deposition taken some time before the trial she said she agreed to postpone the marriage upon the advice of her brother-in-law, but on the trial she denied agreeing to a postponement , and in explanation of her testimony in her deposition said she did not know the meaning of the word *postpone*. At any rate she says that on Tuesday when he came to see her he told her he came to tell her he was not going to marry her. She returned to her home the following Saturday, and the next day he came to see her and told her he had been to see a doctor and was going away the first part of the next week; that nothing was said about their marrying; that he asked her if she had heard from Brown and she said no; that he then asked her if Brown was not coming out to see her that day and she said no; that he said he was and she replied she knew nothing about it; that she asked him if he was going to write to her while he was away, but he got on his horse and rode off and did not answer her. The next day she went to Fulton and instituted this suit. Under instruc-

tions, hereinafter referred to, the case was submitted to the jury, and a verdict for one thousand dollars compensatory damages, and three thousand dollars exemplary damages, was returned for the plaintiff. The defendant then perfected this appeal.

## I.

The principal question in this case is whether the defendant had a right to postpone the marriage upon the appearance of the disease between the date of the contract and the date appointed for its performance. In other words, stated broadly, whether the defendant would have been justified in marrying the plaintiff, even with her consent, while he had the disease. The proposition is stated thus broadly because it is incredible that the plaintiff would have been willing to marry him, if she knew the nature and character of the disease. This too, even if the consummation of the marriage was to be postponed until he could be cured. We prefer to believe she either did not know the nature and character of the disease, or else she did not believe he was so afflicted and thought it was simply an excuse to keep from performing his contract. But there is no room for doubt upon this record that he had the disease, and there is no countervailing evidence that it made its appearance between the date of the contract to marry and the time appointed for the marriage, and without any intervening fault on his part.

Fortunately, there are few reported precedents for the conditions present in this case. It has been held that if a party to a marriage contract develops a disease, which renders it unsafe or improper for him to marry, without intervening fault on his part between the date of the contract and the date appointed for the marriage, he is entitled to have the ceremony postponed until the result of the disease is known or he

is cured.   [Allen v. Baker, 86 N. C. 91; Sanders v. Coleman, 97 Va. 690; Shackleford v. Hamilton, 93 Ky. 80; Mabin v. Webster, 129 Ind. 430.]  Of course, if the defendant entered into the contract knowing of such an impediment to its consummation, it would be an aggravation of the plaintiff's damages and she would be entitled to refuse to marry him and to treat his condition as a breach of the contract—a fraud perpetrated upon her.   Marriage is a contract but it is not merely a civil contract, for it can only be entered into in a manner recognized by law and can only be dissolved in a like manner.   The State is the third party to every such contract and has a direct interest therein.   [Blank v. Nohl, 112 Mo. l. c. 167; State v. Bittick, 103 Mo. 183.]  Certain marriages are prohibited by law because of their detrimental effects upon society and the human species.   Every contract of marriage implies that the contracting parties know of no legal or physical impediment to the contractual relation and its consequences.  "Wilfully to communicate a venereal disease is clearly cruelty, for it is misconduct tending to impair the health and tends to render cohabitation unsafe," and it is therefore, a ground for divorce, whether specifically enumerated in the statutory causes for divorce or not.   [9 Am. and Eng. Ency. of Law (2 Ed.), p. 792, and cases cited.   And as specially bearing on this case, see Venzke v. Venzke, 94 Cal. 225, and Boughner v. Boughner, 41 S. W. Rep. 26.]

In State v. Marcks, 140 Mo. l. c. 677, it was said by SHERWOOD, J., that intercourse with a woman, though she was willing thereto, by a man who was infected with a venereal disease, would constitute the act a common assault, for the fraud vitiated the consent, and in support of the statement he cited the cases of Reg. v. Bennett, 4 F. & F. 1105; Reg. v. Sinclair, 13 Cox C. C. 28; Com. v. Stratton, 114 Mass. 303.

If the principles announced in the cases hereinbefore cited be correct, it is also true that it is legally, as well as

morally, wrong for a man, while infected with such a disease, to marry, and a man for such cause is entitled to demand a postponement of the marriage until he is cured.    If the thing to be performed becomes unlawful without his intervening fault, after the contract is entered into, the performance is excused by force of law. [Sauner v. Ins. Co., 41 Mo. App. 480.]

The idea that the ceremony should be performed and the consummation of the marriage postponed until he is cured is not only intolerable but obnoxious to a proper subservance of the public interests and morals.  This too, whether the woman knows his condition and consents to such an arrangement. or not, for though she may be willing to waive the defect, or be indifferent to the condition or its consequences to her and her children, the third party to the contract, the State, has a right to and does object.    If the disease is of a temporary character, such as was the case here, and could be easily cured, the defendant is entitled to postpone the marriage until he is cured, and if the disease is of a permanent character, such as was the fact in the North Carolina, Kentucky and Virginia cases cited, the defendant is not only entitled to refuse to carry out the contract, but it is his duty to do so.

## II.

The instruction given by the court of its own motion was to the effect that if the disease was of a temporary character and could ordinarily be cured in a reasonable time and if the plaintiff knew its character and consented to marry him and that he should afterwards subject himself to proper treatment, then the disease constituted no defense in this case; otherwise, if the disease was permanent or rendered the defendant unfit for the discharge of marital duties.  For the rea-

sons given this instruction is erroneous. The fifth and eighth instructions asked by the defendant and refused by the court, to the effect that under the circumstances of this case the defendant had a right to postpone the marriage temporarily, that is until he was cured, whether the plaintiff consented to it or not, correctly state the law and should have been given.

The sixth instruction given for the plaintiff was also erroneous. It told the jury that if the plaintiff was engaged to Brown, and the defendant induced her to break that engagement and promise to marry the defendant, he not intending in good faith to marry her, such conduct was an aggravation of the plaintiff's damages. If the plaintiff was engaged to Brown and broke the contract she was a wrongdoer even though she did so to marry defendant, and she is not entitled to recover from defendant any damages growing out of her own wrongful act in breaking her promise to marry Brown. [Hahn v. Bettinger, 83 N. W. Rep. 467.]

### III.

The second count of the petition alleges that the defendant entered into the contract wilfully, falsely, fraudulently and maliciously, not for the purpose of marrying her, but to humiliate and disgrace her, and asks five thousand dollars punitive damages therefor. The third instruction given for the plaintiff authorizes a verdict for punitive damages if such was the case, and the jury gave plaintiff three thousand dollars exemplary damages, that is, three times as much for punishment as it gave her for her compensatory damages. This is, as far as we are advised, the first case on record, for maliciously maintaining a suit in the courts of Cupid. If the defendant fraudulently entered into the contract the plaintiff was entitled to withdraw from the contract, for the defendant's fraud vitiated her consent. If the defendant

entered his suit in malice and not in love, this aggravated the plaintiff's damages, and she is entitled to recover compensation therefor, but not punitive damages. The measure of damages in cases for breach of promise of marriage "is the injury to the plaintiff's feelings, affections, and wounded pride, as well as the loss of marriage (Wilbur v. Johnson, 58 Mo. l. c. 603), and seduction may be given in evidence to aggravate the damages (Green v. Spencer, 3 Mo. 318; Hill v. Maupin, Id. 324; Wilbur v. Johnson, *supra*; Bird v. Thompson, 96 Mo. l. c. 428)." Liese v. Meyer, 143 Mo. l. c. 562.

The statement of the defendant to many persons after he returned from Hartsburg to the effect that he never had intended marrying the plaintiff, and had only taken the matter as far as he had to show Alfred Longley, Bill Gibbs and Mr. Reynolds that he could marry her if he wanted to, were unmanly, cruel and depraved, and were properly admitted in evidence to aggravate plaintiff's damages. But they do not constitute a separate cause of action, nor can exemplary or punitive damages, as such, be recovered for a breach of a contract of marriage. The law punishes the defendant for the breach of his contract by making him compensate the plaintiff whether his intentions when he entered into the contract were sincere or sinister. The plaintiff's second count, therefore, stated no distinct cause of action and her third instruction was erroneous. The jury should have been told to consider these matters as an aggravation of her damages.

This action was begun eight days after the day fixed for the marriage, and before the time plaintiff was cured or could reasonably have been cured. The evidence is conflicting as to whether the plaintiff consented to the postponement, but the defendant was entitled to postpone it until he was cured, whether she consented or not. Ordinarily this would lead to

the conclusion that the action was prematurely brought. But in this case, the defendant's acts and declarations after the date set for the marriage afford sufficient basis for the charge that he did not intend to fulfill his contract, even after he was cured. The plaintiff was therefore excused from going through the formality of waiting until he was well and then demanding a performance of the contract, before instituting her suit, for his conduct subsequent to the postponement was a renunciation of the contract and constituted a present and immediate breach of his contract, and her cause of action accrued then. [Gabriel v. Brick Co., 57 Mo. App. 520; Mfg. Co. v. McCord, 65 Mo. App. 507; Lawson on Contracts, sec. 442.]

For the reasons given the judgment is reversed and the cause remanded for trial anew upon the principles herein announced. All concur.