[No. 6089. Decided November 24, 1906.]

ROSENA E. GROVER, *Respondent,* v. JAMES E. ZOOK, *Appellant.*[1]

BREACH OF MARRIAGE PROMISE—INCURABLE DISEASE AS DEFENSE— WHEN AGREEMENT NOT BINDING—PUBLIC POLICY. A marriage contract is void as against public policy where one of the parties is seriously afflicted with pulmonary tuberculosis and the other has a hereditary taint of such disease, even though the parties were aware of the facts prior to the engagement.

Appeal from a judgment of the superior court for King county, Albertson, J., entered November 21, 1905, upon the verdict of a jury rendered in favor of the plaintiff, in an action to recover damages for the breach of a contract of marriage. Reversed.

*John E. Humphries, George B. Cole,* and *William E. Humphrey,* for appellant.

*John B. Hart,* for respondent.

ROOT, J.—This is an action by respondent to recover damages against appellant for breach of contract of marriage. From a judgment in favor of respondent, the case comes here on appeal.

The principal defense urged by appellant is that respondent, at the time of the mutual promises of marriage, was

[1]Reported in 87 Pac. 638.

afflicted with pulmonary tuberculosis (commonly called con-
sumption), in an incurable form, and has ever since been
physically incapable of entering into the marriage relation.
It was the contention of the respondent, in the trial court
and here, that this condition of respondent constitutes no
defense to her action, for the reason that appellant knew
thereof at the time he promised to marry her. It is admitted
by respondent that she was afflicted with this disease at the
time the engagement of marriage was entered into, although
she claims that she did not know at that time that the malady
affecting her was consumption. There is a conflict in the
evidence as to whether or not appellant knew of the char-
acter of her illness at the time of the engagement. He
swears that he did not. The question of whether or not he
did, turns upon the question as to when the engagement took
place. He claims that they became engaged on the evening
of the 6th of January, 1904. She and her mother and step-
father claim that the engagement did not take place until
the 10th of January, 1904. It appears that they had some
talk about the matter on the evening of January 6, and it is
admitted that she at that time took from her finger a ring
and gave it to him to take to the jeweler's to be used as a
measurement for an engagement ring. He took the ring,
used it for that purpose, and presented her with the engage-
ment ring on the next Sunday, January 10. Her mother
and stepfather testify that, on the latter date, they informed
appellant that the ailment from which respondent was suffer-
ing was consumption; that this information was given him
while she was not present; that he said he would marry her
notwithstanding this; that it was then planned by them that
she should be sent to Arizona, where it was believed that the
climate would cure or ameliorate her diseased condition.

Appellant denies that he knew of the character of her ail-
ment until after she had gone to Arizona. Her mother testi-
fied that she informed respondent of the nature of the malady
after she reached Arizona. A correspondence was main-

tained during the time she was there, between herself and appellant, he making her many suggestions as to taking care of herself and as to the character of treatment she should follow, and sending her books and pamphlets giving such information and directions. She returned in the following April much improved, as she believed. However, she had an attack of appendicitis, necessitating an operation, which seriously weakened her. She was in the hospital sixteen days on account of this operation, leaving there on the 16th of May. It was understood between them that their marriage was to take place in June. On account of her physical condition in June, it was mutually agreed that the marriage should be postponed until autumn. When the latter season arrived, she and her parents requested appellant to carry out his promise of marriage. It seems that there had been an understanding between them that they would get married and attend the World's Fair in St. Louis, in September or October. She and her parents requested appellant to carry out this plan. He insisted that she was physically unable to be married, but that he would marry her when she recovered. The controversy growing out of the matter occasioned strained relations between the parents and appellant, and he visited their home seldom thereafter. Finally, in December, 1904, he wrote respondent a letter in effect expressing a desire to terminate the engagement.

Upon the trial there was some indefiniteness in the evidence as to the seriousness of her condition. She admitted upon the witness stand that, for about a year prior to the time of the trial, she had been sleeping out of doors on the porch at the side of the house, in order to have the benefit of the open air; that while in Arizona she had lived most of the time in a tent, being much of the time confined to her bed and having night sweats and a cough, and having had several "fainting spells;" that since her return she had been free from the night sweats, but still had the cough; that she had continu-

ously followed, and was then following, the directions and
treatment recommended by appellant and the books he had
furnished her; that she was taking cod-liver oil and practi-
cing the "breathing exercises." The doctors who attended
her at the hospital made an examination and found that she
was at that time afflicted with pulmonary tuberculosis. One
physician who examined her a few days before the trial, at
the request of her attorney, testified that she at that time
had the disease., In fact, it was not disputed that she had
never recovered since the engagement; but she believed her-
self to be much improved over her condition as it was when
she started for Arizona. Her stepfather testified that their
family physician had said that he did not deem it advisable
for her to get married. Appellant testified that his father
and mother had died from this disease, and that he had for
many years practiced "breathing exercises" for self-protec-
tion therefrom. He urged that, by reason of the diseased
condition of respondent and of the taint in himself, the proper
functions of marriage could not be consummated, and that
their marriage would be detrimental to the health of her,
himself, and any issue they might have, and in contravention
of public policy.

As to the question of the date of the engagement, and as
to whether or not he knew of her having consumption at the
time he became engaged to her, while the evidence would seem
to make his version reasonable, yet as the jury evidently
reached the other conclusion, we will accept their findings as
correct. The trial court ruled upon the evidence, and in-
structed the jury, upon the theory that the appellant was
liable for a breach of the agreement if, at the time of the
making thereof, he knew the character of appellant's ailment.
Proper exceptions, in different form, questioned the correct-
ness of this view.

The question presented to the court is this: Did appel-
lant, under the circumstances, have a legal right to disre-

gard the promise of marriage he had given respondent? In the domain of morals it is a maxim that a bad promise is better broken than kept. Moral considerations must have a predominating influence upon such a question as now confronts us. In fact, they constitute the reason, the basis and the life of the law applicable in a case of this character. The most profound philosophers join with the wisest statesmen in maintaining the proposition that the home is the unit of the state, and that the character of a people and the stability and welfare of the nation must largely depend upon the healthful and wholesome influence of the home life. By reason of this, we find the home and the members thereof, especially the young and dependent, sheltered by the protecting care of various statutes, all being evidences and expressions of that public policy which deems the home and its inmates appropriate objects of the solicitude and care of the state.

The paramount consideration involved in the determination of this case is not that appertaining solely to the parties to this action—although as to each of them it is of great importance—but it is as to the community, the state and to humanity in general. Here we have a man and woman engaged to be married. The man is of a family several members of which have died with pulmonary consumption. The woman is afflicted with the same disease to such an extent that it becomes necessary for her to go to a distant portion of the country to recuperate, which she does, returning with the affliction still upon her and with small, if any, assurances of recovery. Under these circumstances, if the marriage were to be consummated, what would be the natural consequences to be anticipated? Unconditional promises of marriage, exchanged by a man and woman, imply respectively that each is physically, morally, and legally competent to enter the status of matrimony, and capable, insofar as he or she knows or has reason to believe, of effectuating the principal purposes of the marriage relation. One of the most important functions of wedlock is the procreation of children. Off-

spring are the natural result and ofttimes the chief purpose
of marriage. That the thought of bringing a child into the
world should be one of the most serious that can engage the
mind of a human being needs but to be suggested. Born
amidst the most favorable environment, there lies before
every babe a life of uncertainty so great that no worthy
parent may contemplate it without a tremor of apprehension.
Thus launched upon the sea of time and eternity, what parent
can dwell upon the birth of his child without the keenest
sense of anxiety and responsibility? If the child born in
health and with a body of vigor be a matter of deep concern
to a parent, what must be said of the advent of a babe bur-
dened with the hereditary plaugue of consumption? That
pulmonary tuberculosis is both contagious and hereditary, as
these terms are understood (although possibly not in a strictly
technical and professional sense), as well as infectious, ad-
mits of little, if any, doubt. That a mother seriously ill with
that disease and a father with a hereditary taint thereof in
his blood could bring forth a child exempt therefrom is un-
believable. For parents thus afflicted to bring into the world
a child would be not only detrimental to the welfare of the
state and an offense to the instincts of humanity, but it would
be, as against the innocent babe, a moral wrong most abhor-
rent. Such a child must of necessity be a burden to itself
and others and devoid of the joys and blessings that make
life endurable. In declining to carry out his promise of mar-
riage, it may be presumed that appellant apprehended the
natural and legitimate consequences of such a union. In ad-
dition to the thought of progeny, there would be also that of
the aggravation of the disease as to both himself and pros-
pective wife, the medical expert evidence showing that the
intimate association of married life would tend to augment the
ravages of the malady upon each.

The apprehension felt by the people of this state from the
disease under consideration is evidenced by a statute enacted

by the legislature in 1899, entitled "An act to prevent the spread of tuberculosis," etc. Laws 1899, page 117. Section 5 of that statute reads as follows:

"It is hereby made the duty of every person having tuberculosis and of every one attending such person, and of the authorities of public and private institutions, hospitals or dispensaries, to observe and enforce the sanitary rules and regulations prescribed from time to time by the boards of health, of such cities and of the state for the prevention of the spread of pulmonary tuberculosis."

Other statutes exist having for their purpose the prevention of the spread of this and other contagious and infectious diseases. The enforcement of certain rules and the distribution of literature giving information as to the prevention and treatment of such cases is enjoined upon boards of health and others. Such a document is the "Circular of Information to prevent the spread of Consumption," which is now before us. Besides much other information and many directions, it contains the following items:

"Consumption is the most common and the most fatal of all diseases. It is a disease of the lungs caused by a germ which is breathed into the lungs or gets into the body with food. This germ of consumption comes only from some other person or animal that has the disease. . . . A consumptive should never sleep in the same bed with another person. . . . A consumptive mother should never nurse her baby; it is bad for the mother and dangerous for the baby. A consumptive should not cook or prepare foods for others. . . When a consumptive moves to another house, notify the health authorities by 'phone or card, so that they can see that the old home is properly disinfected according to law. Do not share a consumptive's bed, or use the personal property, including dishes, belonging to one."

In the face of legal restrictions and requirements of this character, it is difficult to understand how a man or woman afflicted with this plague may legally insist upon the fulfillment of a promise of marriage which, if consummated, would endanger the health and life of both and blight the life of

any offspring that might be born.   Any person entering
marriage, knowing himself to be seriously afflicted with pul-
monary tuberculosis, violates the spirit, if not the exact
letter, of the statutes enacted to prevent the spread of that
disease.   The same is true of one who marries another know-
ing him or her to be thus afflicted.   An agreement which,
if executed, would thwart the beneficent purpose of such
statutes, ought not to be held binding.   The principles we
believe controlling here have been recognized and enunciated
by the courts in several of our sister states.   The supreme
court of appeals of Virginia, in the case of *Sanders v. Cole-
man*, 97 Va. 690, 34 S. E. 621, 47 L. R. A. 581, made use
of the following expressions:

"Under the expression 'the act of God' is comprehended
all misfortunes and accidents arising from inevitable necessity
which human prudence could not foresee or prevent.   Hence
it is held that "illness,' being beyond the power of man to
control or prevent, is the act of God.   Story on Bailments,
sec. 25, 511; *Fish v. Chapman*, 2 Ga. 349; *Gleason v.
Va. M. R. R. Co.*, 140 U. S. 435.   It can no longer be
doubted that, if the performance of a contract is rendered
impossible by the act of God alone, such fact will furnish a
valid excuse for its nonperformance, and such a stipulation
will be understood to be an inherent part of every contract.
This principle, it would seem, should apply with peculiar
force to a marriage contract, the performance of which, ow-
ing to causes subsequently intervening, and altogether inde-
pendent of any default of the party, might result in conse-
quences disastrous to the life or health of the parties, or
either of them.   We hold, therefore, that a contract to
marry is coupled with the implied condition that both of the
parties shall remain in the enjoyment of life and health, and
if the condition of the parties has so changed that the mar-
riage state would endanger the life or health of either, a
breach of the contract is excusable.   *Allen v. Baker*, 86
N. C. 91; *Shackleford v. Hamilton*, 93 Ky. 80; Bishop on
Marriage and Divorce, sec. 219.   In the case at bar the evi-
dence, as to which in our opinion there is no real conflict,
shows that there was a predisposition, in the defendant's
family, to physical trouble of the kind that had developed

with him; that his father had died with a similar disease, and
a brother with urinary trouble; that after his engagement
with the plaintiff, and before the time fixed for the marriage,
the defendant had, without fault on his part, developed and
was suffering with a grave malady, involving the urinary or-
gans, . . . and that an indulgence in sexual inter-
course would aggravate his disease, and likely shorten his
life; and that it would be not only a wrong and injustice to
the defendant, but also to the plaintiff for him to marry in
his condition of health. Marriage is assumed in law to be
made for mutual comfort. The condition of the defendant
precludes any hope of mutual comfort from cohabitation,
. . . Our conclusions upon the law and upon the evi-
dence is that the defendant acted throughout with good
faith, and that the unhappy circumstances in which he found
himself justified the alleged breach of contract to marry
the plaintiff."

What was there said becomes particularly pertinent to
the case at bar, the evidence of the medical experts here be-
ing to the effect that copulation would be exceedingly det-
rimental to one afflicted as was respondent. Applicable in
principle also, is the case of *Shackleford v. Hamilton*, 93
Ky. 80, 19 S. W. 5, 40 Am. St. 166, 15 L. R. A. 531, which
was based upon facts about as follows: Appellant prior to
his engagement to respondent had contracted syphilis, but
believed at the time of his engagement that he was thor-
oughly and permanently cured thereof. Some time after
his engagement to respondent the effects of this disease
again manifested themselves in so serious a form that physi-
cians said it was doubtless incurable. Thereupon appellant
informed respondent that he could not marry her. She de-
clined to release him from his promise and instituted an ac-
tion for damages. The supreme court of Kentucky, in
passing upon the case, said:

"When the marriage contract is consummated, the parties
taking each other for better, for worse, for richer, for
poorer, and agree to cherish each other in sickness and in

32—44 WASH.

health, the fact that the social standing of the one party or other or their pecuniary condition, was not as represented, will afford no ground for relief; still, when there is a mere agreement to marry, there may be such a condition of the one party or the other as to health or other bodily infirmity arising subsequent to the agreement as would authorize either party to decline to enter into the marriage relation, and to hold otherwise would be to place such a contract upon the same footing with cases of mere personal chattels. . . . The text-books establish the doctrine that 'without sexual intercourse the ends of marriage, the procreation of children and the pleasures and enjoyments of matrimony, cannot be attained.' The first cause and reason of matrimony, says Ayliffe, 'ought to be the design of having offspring; so the second ought to be the avoiding of fornication. And the law recognizes these two as its principal ends, namely: a lawful indulgence of the passions to prevent licentiousness, and the procreation of children, according to the evident design of Divine Providence.' (1 Bishop, Mar. and Div., 6th ed., 322. . . . It is impossible for the defendant to fulfill his contract. His disease renders him incapable of marriage without actual damage to the life of the woman he marries by communicating to her and through her to their offspring a loathsome disease that is now, from the testimony in the case, gradually destroying this unfortunate man. . . . No greater crime in law or morals could have been committed by the appellant than a performance of his agreement. The purity of our social system, the interests of the public in preserving sacred the marital relation, the protection of those whose existence may spring from such an unholy alliance, as well as the future welfare and happiness of the parties themselves, require that such a construction should be given this class of contracts; and if there was no precedent for the recognition of the doctrine announced, we would not hesitate to make one."

The same court, in a subsequent case, *Gardner v. Arnett*, 21 Ky. Law 1, 50 S. W. 840, approved the decision and reasoning of the case just cited and, as to the case before it, observed:

"He [defendant] owed it to the plaintiff and to society to refuse to enter into marriage relations with her, and he had

the right to abandon the contract and refuse to marry her
at any time before their marriage was solemnized."

In *Ryder v. Ryder*, 66 Vt. 158, 28 Atl. 1029, 44 Am. St.
833, the supreme court of Vermont annulled a marriage be-
cause the wife had a venereal disease endangering the health
of her husband and any children she might bear.   To the
same effect, in principle, were the decisions in *Smith v.
Smith*, 171 Mass. 404, 50 N. E. 933, 68 Am. St. 440, 41
L. R. A. 800; *McMahen v. McMahen*, 186 Pa. St. 485, 40
Atl. 795, 41 L. R. A. 802; *Svenson v. Svenson*, 178 N. Y. 54,
70 N. E. 120, and *Martin v. Martin*, 54 W. Va. 301, 46
S. E. 120.   In the case of *Goddard v. Westcott*, 82 Mich.
180, 46 N. W. 242, the supreme court of Michigan said:

"While it is the policy of the law to encourage marriage,
it is not the policy of the law to encourage unhappy mar-
riages,"

and the court then, with express approval, quotes from Mr.
Schouler, in 7 South. Law Rev., 65, the following:

"The marriage state ought not to be lightly entered into.
It involves the profoundest interests of human life, trans-
mitting its complex influences direct to posterity, and invad-
ing the happiness of parents and near kindred.   .   .   .
From such a standpoint, we view the marriage engagement
as a period of probation, so to speak, for both parties,—
their opportunity for finding one another out; and if that
probation results in developing incompatibility of tastes and
temperament, coldness, suspicion, and incurable repugnance
of one to the other, though all this may impute no vice to
either, nor afford matter for judicial demonstration, duty
requires that the match be broken off."

In the case of *Allen v. Baker*, 86 N. C. 91, 41 Am. Rep.
444, the supreme court of North Carolina spoke as follows:

"We cannot understand how one can be liable for not ful-
filling a contract, when the very performance thereof would
in itself amount to a great crime, not only against the in-
dividual, but against society itself.   .   .   .   It is likewise
true, that whenever the main part of an executory contract

becomes impossible of performance from any cause beyond the power of the party to control, it will be treated as having become impossible *in toto*. Why should not the same principle apply to a contract the fulfillment of which, owing to causes subsequently intervening and altogether independent of any default of the party, can only be productive of consequences disastrous to the parties themselves, and such as may entail misery upon others to come after them? . . . The usual, and we may say legitimate, objects sought to be attained by such agreements to marry, are, the comfort of association, the *consortium vitae*, as it is called in the books; the gratification of the natural passions rendered lawful by the union of the parties; and the procreation of children. And if either party should thereafter become, by the act of God and without fault on his own part, unfit for such a relation and incapable of performing the duties incident thereto, then, the law will excuse a noncompliance with the promise —the main part of the contract having become impossible of performance the whole will be considered to be so."

In *Trammell v. Vaughan*, 158 Mo. 214, 59 S. W. 79, 81 Am. St. 302, 51 L. R. A. 854, the supreme court of Missouri employed this language:

"Marriage is a contract but it is not merely a civil contract, for it can only be entered into in a manner recognized by law, and can only be dissolved in a like manner. The state is the third party to every such contract, and has a direct interest therein. (*Blank v. Nohl*, 112 Mo. loc. cit. 167, 20 S. W. 477, 18 L. R. A. 350; *State v. Bittick*, 103 Mo. 183, 15 S. W. 325, 11 L. R. A. 587.) Certain marriages are prohibited by law because of their detrimental effects upon society and the human species. Every contract of marriage implies that the contracting parties know of no legal or physical impediment to the contractual relation and its consequences. . . . If the disease is of a temporary character, such as was the case here, and could be easily cured, the defendant is entitled to postpone the marriage until he is cured; and if the disease is of a permanent character, such as was the fact in the North Carolina, Kentucky, and Virginia cases cited, the defendant is not only entitled to refuse to carry out the contract, but it is his duty to do so."

In the case of *Gring v. Lerch*, 112 Pa. St. 244, 3 Atl. 841, 56 Am. Rep. 314, the supreme court of Pennsylvania spoke as follows:

"It is a mistake to suppose, as was assumed in the point, and affirmed by the court, that the impediment must be of such a nature as would be a ground of divorce after marriage. We are not now dealing with a question of divorce. That is a subject that is regulated by statute, and has no necessary relation to the case in hand. We are considering a contract to marry; a contract which calls for the richest good faith on both sides, and which neither party has the right to enforce against the other, if incapable of performing the full marital duties. A man does not contract to marry a woman for the mere pleasure of paying for her board and washing. He expects and is entitled to something in return, and if the woman with whom he contracts be incapable, by reason of a natural impediment, of giving him the comfort and satisfaction to which, as a married man, he would be entitled, there is a failure of the moving consideration of such contract, and no court ought to enforce it by giving damages for its breach."

In the early case of *Atchinson v. Baker*, 2 Peake (N. P.) 103, Lord Kenyon said: "It would be most mischievous to compel parties to marry who could never live happily together;" and he cites Lord Mansfield as having held, in the case of *Foulkes v. Sellway*, 3 Esp. 236, that a defendant was not liable in damages for breach of promise where the character of the woman turned out to be different from what he had reason to believe it, and that an infirmity, either bodily or mental, would excuse fulfillment of the marriage agreement.

It is a fundamental proposition that a contract contravening the provisions or policy of a public law is void or voidable. *Macintosh v. Renton*, 2 Wash. Ter. 121; *Cannon v. Cannon*, 26 N. J. Eq. 316; *Bowman v. Gonegal*, 19 La. Ann. 328, 92 Am. Dec. 537; Bishop, Contracts (enlarged edition) § 470, reads:

"No agreement between parties to do a thing prohibited

by law, or subversive of any public interest which the law
cherishes, will be judicially enforced."

And at § 473, the following appears:

"A contract invading any one of the other interests which
the law cherishes, though. to do what is neither indictable
nor prohibited by a statute, termed a contract against public
policy (or sound policy), is likewise void."

9 Cyc. 481, says this:

"If an agreement binds the parties or either of them, or
if the consideration is, to do something opposed to the pub-
lic policy of the state or nation, it is illegal and absolutely
void, however solemnly made.  If the court should enforce
such agreement it would employ its functions in undoing
what it was created to do.  It is not easy to give a precise
definition of public policy.  It is perhaps correct to say
that public policy is that principle of law which holds that
no person cah lawfully do that which has a tendency to be
injurious to the public or against the public good, which
may be designated, as it has sometimes been, the policy of
the law or public policy in relation to the administration of
the law.  Where a contract belongs to this class, it will be
declared void, although in the particular instance no injury
to the public may have resulted.  In other words its validity
is determined by its general tendency at the time it is made,
and if this is opposed to the interests of the public it will
be invalid, even though the intent of the parties was good
and no injury to the public would result in the particular
case.  The test is the evil tendency of the contract and not
its actual injury to the public in a particular instance."

To the same effect:  15 Am. & Eng. Ency. Law (2d ed.),
p. 933.

Counsel for respondent cite us to cases where a man,
promising to marry a woman whom he knew to have been
formerly unchaste, was held to be bound by such promise.
Such a case and this are not analogous.  There the man by
his promise overlooks the former shortcomings of the woman,
and it is a matter concerning him only.  She would have
the ability to, and presumably would, reform and become a
good wife and worthy mother.  This is to the advantage of

society, and not inconsistent with sound public policy, and the law should interpose no hindrance thereto. But a consumptive woman is physically incapable of becoming a healthful companion or the mother of healthy issue. It is not a condition that she voluntarily created or can change at will. The evils to follow her marriage could not be confined to herself and husband, but must of necessity concern and injuriously affect others. The nature and natural sequences of a contract of marriage are such that the state is of necessity a third party to, and interested in, every such agreement. Its interests forbid the enforcement of such a contract between parties physically incapable of making the married state beneficial to themselves or society.

We are not disposed to take into consideration any matters personal only to the appellant. If he knew of the nature of respondent's ailment when he agreed to marry her and agreed to make her his wife, notwithstanding the same, he ought not to escape responsibility by reason of any inconvenience affecting only himself. But the interests · of the community and state step in and, with dictates of humanity, demand that no human compact shall be upheld that has for one of its principal objects the bringing into the world of helpless, hopeless, plague-cursed, innocent babes. We can sanction the breaking of a promise and relieve from the terms of a deliberate agreement only when the alternative involves results more deplorable. Had these parties married, it is inconceivable that any of the important ends of marriage could have been attained. It is morally certain that sickness, grief and sorrow must have been the sequence of such a union. These considerations, with the possibility and probability of issue afflicted with this terrible malady, constrain us to hold that the marriage agreement was not binding—that it was the privilege of either party to withdraw therefrom. Rule 126 of Greenhood on Public Policy reads as follows:

"No one can estop himself from proving facts which will

show a contract to be opposed to public policy." It having been the privilege and, as we believe, the moral and legal duty of appellant to decline to carry out the agreement, he cannot be held responsible in damages for so doing.

The following authorities bear on some of the questions here involved: *Turnbull v. Farnsworth*, 1 Wash. Ter. 444; *Standard Furniture Co. v. Van Alstine*, 22 Wash. 670, 62 Pac. 145, 79 Am. St. 961, 51 L. R. A. 889; *Graves v. Johnson*, 156 Mass. 211, 30 N. E. 818, 32 Am. St. 446, 15 L. R. A. 834; *Armstrong v. Toler*, 11 Wheat. 258; *Ah Doon v. Smith*, 25 Ore. 89, 34 Pac. 1093; *Tatum v. Kelley*, 25 Ark. 209; *Woodworth v. Bennett*, 43 N. Y. 273, 3 Am. Rep. 706; *Gaylord v. Soragen*, 32 Vt. 110, 76 Am. Dec. 154; *Ralston v. Boady*, 20 Ga. 449; *Mabin v. Webster*, 129 Ind. 430, 28 N. E. 863, 28 Am. St. 199; *Ryder v. Ryder*, 66 Vt. 158, 28 Atl. 1029, 44 Am. St. 833; *Gulick v. Gulick*, 41 N. J. L. 13; *Kantzler v. Grant*, 2 Ill. App. 236; *Walker v. Johnson*, 6 Ind. App. 600; *Miller v. Rosier*, 31 Mich. 475; *Sprague v. Craig*, 51 Ill. 288; 4 Am. & Eng. Ency. Law (2d ed.), pp. 893, 894, and note; Wharton, Contracts, 324; Pollock, Contracts, 337; 2 Addison, Contracts, 7138; Gould & Pyle, Cyclopedia Medicine & Surgery; Story, Contracts, § 675; Anders, Practice of Medicine, 268, 270-2; Beach, Modern Contract Law, §§ 1498, 1499.

The judgment of the honorable superior court is reversed, and the cause remanded with instructions to dismiss the action.

MOUNT, C. J., DUNBAR, CROW, HADLEY, FULLERTON, and RUDKIN, JJ., concur.