IN RE ESTATE OF EDWARD A. OLDFIELD, Deceased.
NANCY BOWIE, Appellee, v. WM. TROWBRIDGE, Executor, Appellant.

**TRIAL:** Instructions—Applicability to Pleading—Pleading Express
1 Contract—Recovering on Implied One. In an action to recover against the estate of a decedent *on an express contract* for services, an instruction that ''direct evidence of such agreement is not necessary if, from all the facts and circumstances appearing in evidence in the case, you can find by a preponderance of the evidence that there must have been such an agreement,'' is not subject to the vice of allowing a recovery on an *implied* agreement, especially when the jury was otherwise told that claimant must recover, if at all, on proof of an express agreement.

**EXECUTORS AND ADMINISTRATORS:** Claims—Services as Mem·
2 ber of Family—Instructions—Assumption of Facts. In an action to recover against the estate of a decedent on an express contract for services, which contract was denied, instructions reviewed, and *held* (a) not to assume that the record showed evidence of such express agreement, and (b) to properly present defendant's claim that the home, food and clothing furnished claimant by decedent fully compensated her for all services rendered, and that the agreement contemplated that one should be in satisfaction of the other.

**LIMITATION OF ACTIONS:** Current Account—Services for De-
3 cedents. Claims for services rendered for decedent, and continuously during a series of years, accrue on the date of the last item of the account. (Sec. 3449, Code, 1897.)

**MARRIAGE:** Breach of Promise—Subsequent Incurable Disease—
4 Effect. One may, without rendering himself liable in damages, refuse to consummate a contract of marriage when, at the time the contract is entered into, but unbeknown to him, he was af-

flicted with a fatal and incurable malady, of such nature that marriage would, to a reasonable certainty, aggravate it and hasten his death, and thereby defeat all consideration for the contract to marry. So *held* where the disease was pernicious anemia.

EVANS, C. J., and SALINGER, J., dissent.

PLEADING: Amendments—Amendments After Reversal—Discretion of Court. Amendments raising new issues may be allowed, even after a reversal on appeal.

*Appeal from Carroll District Court.*—M. E. HUTCHISON, Judge.

THURSDAY, MARCH 23, 1916.

ACTION for damages for breach of promise of marriage, and for services rendered decedent during his lifetime. Both parties appeal.—*Affirmed* on both appeals.

*Chas. C. Helmer,* for appellant.

*Brown McCrary,* for appellee.

GAYNOR, J.—I. The controversy in this suit is based on two claims, filed against the estate of Edward A. Oldfield, deceased. The plaintiff states her causes of action in two counts. In the first count of her petition, she seeks to recover damages for a breach of promise of marriage. In the second count, she seeks to recover for personal services rendered by her to decedent during his lifetime. It appears that Edward A. Oldfield died on December 2, 1910, testate; that his will was duly admitted to probate, and Wm. Trowbridge, defendant herein, was appointed executor of the will. On the 11th day of January, 1911, the appellee (plaintiff) filed a claim against the estate, wherein she asks $10,000 on account of a breach of promise of marriage which she alleges was made between her and the decedent. In the second count, she claims $3,975 for services rendered by her for decedent from September 14, 1893, to September 2, 1910. To the first count of plaintiff's petition, based on an alleged promise of marriage the defendant interposed the following defenses: First, that

any agreement of marriage entered into was, by mutual consent of the parties, postponed and deferred from time to time up to the death of Edward A. Oldfield; that consummation of the agreement was prevented by said death; second, that, at the time the alleged breach of promise occurred, if any, the said Edward A. Oldfield was suffering from an incurable disease, known as pernicious anemia, which made it impractical and impossible for him to consummate a marriage with the plaintiff; that any marriage at that time would have aggravated said disease and shortened his life; that the incurable character and disastrous consequences of the disease were unknown to Oldfield at the time of the alleged promise; third, defendant pleads the physical condition of Oldfield in mitigation of damages. To the second count of plaintiff's petition, based on the claim for services rendered, the defendant pleads: first, that all of said claims and demands which accrued prior to five years before the filing of the claim are barred by the statute of limitations; second, that, during the time claimed for services rendered, the plaintiff was a member of decedent's family, receiving support therein as a member of the family; that, during all the time that plaintiff and her five children resided with Oldfield, she and they were furnished with food, clothing and other necessaries of life in decedent's family; that Oldfield received no pay therefor except from the services rendered by the plaintiff and her children; that the necessaries furnished were at least of the value of the services performed; and that she was fully compensated therefor by such support and maintenance; that, at the time plaintiff resided in the family of Edward A. Oldfield, the defendant avers that the said Oldfield believed that the services rendered by the plaintiff during such time were gratuitous, and were rendered by the plaintiff and received by Oldfield without the expectation on the part of either that payment should be made therefor. In addition to the foregoing defenses, the defendant pleads a general denial as to all matters alleged by the plaintiff in her respective claims.

Upon the issue thus tendered, the cause was tried to a jury, and a general verdict returned for the plaintiff for $3,164. The jury found, however, specially that the plaintiff was not entitled to recover on the first count of her petition for the breach of promise of marriage. A judgment having been entered upon the verdict, both parties appeal. The defendant, having appealed first, is designated as appellant, and the plaintiff as appellee, when referred to hereafter in this opinion.

As defendant first appealed, we will give our attention first to a consideration of the claim based upon the second count of the petition, upon which the jury allowed plaintiff to recover.

In this count of her petition, she seeks to recover for services rendered, and alleges that, in the year 1893, Edward Oldfield lived on a farm in Sac County; that, at his instance and request, and by express agreement, this plaintiff came to his place to work; that, in 1894, she brought her family with her, consisting of five children; that she continued to work for him from September, 1893, to September, 1910, except when temporarily away on a visit; that the reasonable value of her services, during all the time, was $5.00 a week; that her work consisted of household duties, work and labor in the house, and manual labor upon the farm. The plaintiff further alleges that payments were made to her from time to time during said period.

The first alleged error relied upon by the defendant for reversal is based on the action of the court in giving Instruction 25 to the jury, on its own motion. The theory upon which the error is predicated is that the plaintiff's petition seeks to recover for services rendered under express contract, while this instruction, it is claimed, authorizes her to recover on an implied contract.

1. TRIAL: instructions: applicability to pleading: pleading express contract: recovering on implied one.

A mere statement of what the instructions contain is sufficient to negative appellant's contention. The

court recognized the fact that the plaintiff predicates her right to recover upon an express agreement, and denied her right to recover except upon proof of such express agreement. The court said:

"The plaintiff alleges that she went to work for decedent under an express agreement that she should do so. Direct evidence of such agreement is, however, not necessary, if, from all the facts and circumstances appearing in evidence in the case, you can find by a preponderance of the evidence that there must have been such an agreement."

The court, in the instruction complained of, simply told the jury that the agreement alleged could be proven by facts and circumstances, as well as by direct evidence. Many facts about which there is controversy are so proven. The mouths of both parties to this controversy were closed; one by death, and one by operation of law. That there was, or was not, such an agreement as she alleged, was a substantive fact to be proven, as the court says, by direct evidence, or by facts and circumstances appearing in evidence,—not necessarily by direct evidence. If the facts and circumstances proven established in the minds of the jury a belief in the existence of the controverted fact, then the fact itself was proven, even though there were no direct evidence of its existence.

That a party cannot recover upon an implied contract where he pleads and relies upon an express contract, is elementary. No rule is more familiar to the profession than the one which requires a case to be tried upon issues made in the pleadings. No ultimate fact, not pleaded, can be considered in determining such liability.

This rule was recognized on the former appeal of this case, 158 Iowa 98, 100, in which it was said:

"Direct evidence of such an agreement for employment is not necessary, however. If from all the facts and circumstances appearing in the case it can fairly be said that there must have been such an agreement, it is sufficient."

In the 28th instruction given to the jury, the court expressly said:

"In this case, plaintiff cannot recover anything for her services . . . unless she has established . . . that such services were rendered by her, under and by virtue of an express agreement with Oldfield for the performance of the same."

It is next contended that the court erred in giving the 28th Instruction, for the reason, as it is said in argument, that the instruction assumes that there is evidence of an express agreement, and that such agreement did not contemplate payment for such services by furnishing plaintiff with a home, food, clothing, etc., for herself and family. This instruction must be read in connection with instruction 26 and 27, immediately preceding, in order that its full import and purpose may be understood. The contention of the defendant was, that the plaintiff was a member of decedent's family; that the labor performed was performed by her as a member of the family; that there was no reasonable expectation on her part, of receiving pay, and that there was no expectation, on his part, of compensating her for the services; that in no event could she recover for services rendered, in the absence of an express contract such as alleged by her in her petition.

2. EXECUTORS AND ADMINISTRATORS: claims: services as member of family: instructions: assumption of facts.

The 26th and 27th instructions given are as follows:

"Where one person performs services for another, and the other furnishes a home, food and clothing for the first, a presumption arises that neither expects to pay or receive compensation. If, therefore, you find by a preponderance of the evidence that plaintiff did perform services for Oldfield, and Oldfield furnished a home, food and clothing to the plaintiff, and if you further find that the plaintiff has not shown by a preponderance of the evidence that Oldfield agreed or expected to pay her for her services, then the plaintiff is not

entitled to receive anything therefor, and your verdict should be for the defendant on this branch of the case.

"If you should find plaintiff to have been living with decedent as a member of his family and receiving support therein, a presumption would arise that such services as rendered by her were gratuitous, and the plaintiff must overcome this presumption in order to entitle her to recover for such services, by showing by a preponderance of the evidence that such services were rendered under an express agreement for the rendering of the same, as heretofore explained to you in these instructions."

Immediately following which is this portion of the 28th instruction, of which complaint is made, reading as follows:

"If she has thus established that such services were rendered by her under and by virtue of an express agreement with Oldfield for such services, and by which she was to be paid therefor, then, in such event, she would be entitled to recover herein for such services even though they may have been rendered at a time when she was furnished a home, food and clothing by decedent, and was living with decedent in his home, and with his family."

The contention of appellant is that the court ignores the claim made by the defendant, that the home, food and clothing furnished plaintiff fully compensate her for all the services rendered, and that the agreement contemplated that one should be in satisfaction of the other. We do not construe the instruction as so holding. In the 21st instruction given by the court, the jury was expressly told that one of the defenses is that plaintiff has been fully paid for such services by reason of payments made to her by decedent, and by reason of food, clothing and necessities furnished her and the members of her family, and said to the jury that they should determine from the evidence whether this contention was true or not, and should consider all the evidence, the circumstances under which the services were rendered, and the supplies furnished, and the extent of the same, and what services,

if any, were rendered by the children, in determining this question.

It is next contended that this record discloses such a state of facts that all of plaintiff's claim, prior to five years immediately preceding the filing of the claim, was barred by the statute of limitations.

3. LIMITATION OF ACTIONS: current account: services for decedents.

This question was before the court on the former appeal, and the evidence on this point was substantially the same as in this record. This court said:

"The evidence as a whole tended to show that the service was continuous for the entire time, up to at least within a year or two of the commencement of this action, with the exception of one or two brief periods when plaintiff was absent on visits, and, such being the case, the statute did not begin to run," citing *Kilbourn v. Anderson,* 77 Iowa 501; *Asher v. Pegg,* 146 Iowa 541.

We think this disposes of this same contention made upon this appeal. See *Hensley v. Davidson Bros. Co.,* 135 Iowa 106.

It is next contended that the verdict is excessive. In this contention, we cannot concur. We may further say that a review of the evidence in this case satisfies us that the verdict on this branch of the case is sustained by it.

We find no reversible error upon defendant's appeal.

II.   This brings us to a consideration of plaintiff's appeal, and calls for a review of the record made upon the claim of plaintiff for breach of promise of marriage.

4. MARRIAGE: breach of promise: subsequent incurable disease: effect.

Assuming, for the purposes of this opinion, that the record disclosed a promise of marriage entered into between plaintiff and deceased, substantially as claimed by the plaintiff; assuming that this promise continued to be recognized by both parties as binding upon each; assuming that, in September, 1910, the deceased refused to fulfill his promise and marry the plaintiff; assuming that, at the time of the alleged breach of promise, Oldfield was suffering from pernicious anemia, and that the same was an

incurable disease, and that marriage would aggravate the disease and would have tended to shorten the life of the deceased, and that this was not known to Oldfield at the time of the making of the promise, and that the condition arose subsequently to the making of the promise, and that this disease caused his death on December 2, 1910, the question presented is, whether or not such a finding would excuse the conduct of the deceased in refusing to consummate his promise by marriage, and defeat plaintiff's right to recover damages based on such refusal.

The testimony of Dr. Patty is that he was first consulted by Oldfield in February, 1910; that Oldfield then said he had no appetite, was tired all the time and unable to work; that he was easily fatigued, short of breath and unable to sleep well; that he made an examination of him; that he had hemic murmurs of the heart; that his condition was due to a loss of blood elements; that his condition was serious; that he had pernicious anemia; that when he first consulted him, he was pale, and his eyelids showed little color; that he informed Oldfield that his condition was serious; that he saw him on August 3rd of that year; that he had then become weaker and unable to do anything; that he informed Oldfield that his condition was fatal; that he died of pernicious anemia; that, at the time he first consulted him, he was unable physically to fulfill a contract of marriage.

Dr. Kessler testified that the disease of pernicious anemia may last two or three months,—possibly more than a year,— but usually a year is the limit; that, if it appeared in the early part of 1910 that Oldfield had no appetite, was tired all the time and unable to work, was easily fatigued, unable to sleep well and that an examination disclosed hemic murmurs of the heart, and his eyes were pale, and he died September 2, 1910, he would say that he died of pernicious anemia; that, if a man was suffering from pernicious anemia it would have a bad effect on his health to marry and have intercourse; that it would aggravate the disease and shorten his life; that,

in treating pernicious anemia, the patient is advised to refrain from labor, dissipation or excitement,—in other words, take everything as easily as possible and be quiet; that such things would aggravate the disease and shorten his life; that any excitement or exertion would tend to aggravate the disease and shorten the life of the patient; that the disease is debilitating in its character and tends to weaken the vital forces, and, in some cases, impair the mind, and said:

"I would advise a patient suffering from pernicious anemia to avoid excitement and exertion and keep quiet."

The plaintiff, Nancy Bowie, testified that she was away from September, 1909, until April, 1910; that the deceased told her, in February, 1910, that he had been to see a doctor and the doctor told him he could not live. "It was after that time that he told me he would not marry me."

Dollie Sawyer, daughter of the deceased, testified:

"I came back home in April, 1910, because my father wanted me to come back. He said his health was getting very bad. He wanted me to come back and stay with him. I stayed with him until he died. His health was bad during all the summer of 1910 and kept gradually growing worse. I heard him say before Mrs. Bowie that the doctor told him he could not live."

Under the heading, "Propositions of Law Requiring a Reversal," the plaintiff, the cross-appellant, urges but two propositions:

5. PLEADING: amendments: amendments after reversal: discretion of court.

1. "After a case has been tried to a jury upon certain issues and appealed, after reversal, neither party has, as a matter of right, to so amend the pleadings as to raise new issues."

As a matter of right, perhaps no. As a matter of discretion in the court, yes. The amendment complained of was filed with the consent of the court and for reasons then urged before the court. It was a discretionary matter with the court to allow it or not in this particular case.

2. ''Sickness or incurable disease incurred after a promise of marriage, is not ground for releasing him from his agreement to marry.''

Upon this second proposition, the authorities are not agreed. Some courts hold that every contract to marry has coupled with it an implied condition that the parties will not endanger life or health in the consummation of the marriage; that, where illness or disease exists in either party to the contract, such as would render marriage dangerous to the life or health of either, a breach of the contract, based on such unavoidable and unanticipated condition, is excusable.

In *Sanders v. Coleman*, (Va.) 47 L. R. A. (O. S.) 581, the Supreme Court of Virginia said:

''It can no longer be doubted that, if the performance of a contract is rendered impossible by the act of God alone, such fact will furnish a valid excuse for its nonperformance, and such a stipulation will be understood to be an inherent part of every contract. This principle, it would seem, should apply with equal force to a marriage contract, the performance of which, owing to the causes subsequently intervening, and altogether independent of any default of the party, might result in consequences disastrous to the life or health of the parties, or either of them. We hold, therefore, that a contract to marry is coupled with the implied condition that both of the parties shall remain in the enjoyment of life and health, and, if the condition of the parties has so changed that the marriage state would endanger the life or health of either, a breach of the contract is excusable,'' citing *Allen v. Baker*, 86 N. C. 91 (41 Am. Rep. 444); *Shackleford v. Hamilton*, 93 Ky. 80 (15 L. R. A. 531).

The opinion further proceeds:

''In the case at bar the evidence (as to which, in our opinion, there is no real conflict) shows that there was a predisposition in the defendant's family to physical troubles of the kind that had developed with him; that his father had died with a similar disease, and a brother with urinary

trouble; that, after his engagement with the plaintiff and before the time fixed for the marriage, the defendant had, without fault on his part, developed and was suffering with a grave malady, involving the urinary organs, which had continued and kept him constantly under the advice and treatment of a physician, up to the time of the trial; that he had cystitis, with probable inflammation of the urethra, complicated with enlargement of the prostate gland, and that an indulgence . . . would aggravate his· disease, and likely shorten his life; and that it would be, not only a wrong and an injustice to the defendant, but also to the plaintiff, for him to marry in his condition of health. Marriage is assumed in law to be for mutual comfort. The condition of the defendant precludes any hope of mutual comfort from cohabitation. On the contrary, an indulgence . . ' . would aggravate his disease and enhance the chances of a fatal result. . . . Our conclusion upon the law and the evidence is that the defendant acted throughout with good faith, and that the unhappy circumstances in which he found himself justified the alleged breach of his contract to marry the plaintiff.''

As supporting this rule, we have *Grover v. Zook,* 44 Wash. 489 (120 Am. St. Rep. 1012), in which the rule laid down in the *Sanders* case, *supra,* was quoted with approval. In this *Zook* case, the defendant was afflicted with pulmonary tuberculosis (commonly called consumption), in an incurable form. The woman sought to recover damages for the breach of the contract. This was interposed as a defense. The sufficiency of the defense was questioned on many grounds, but was sustained on the ground that the consummation of the marriage would endanger not only his life but the life of the woman, and would affect the offspring, if any, resulting from the marriage. It appeared in this case that several members of defendant's family had died of pulmonary consumption.

As recognizing the doctrine expressed in these two cases,

though not directly in point, see *Beans v. Denny,* 141 Iowa 52 ; *Vierling v. Binder,* 113 Iowa 337 ; *Trammell v. Vaughan,* 158 Mo. 214 (59 S. W. 79, 51 L. R. A. 854) ; *Shackleford v. Hamilton,* 15 L. R. A. (O. S.) 531.

In this last case, the defense interposed was that, long prior to any contract of marriage with the plaintiff, defendant had contracted a loathsome disease called syphilis, and was treated for it by skilled physicians until he was pronounced cured; that physicians advised him he was cured, and was in a fit state to marry and could safely do so; that, after this time, and with the belief in good faith that the malady no longer existed, he made the contract with the plaintiff; that, after the engagement to marry, and without any fault on his part, the symptoms of the disease reappeared, and he was advised by physicians that he should not marry; that, prior to the bringing of this action, he made known the fact to the plaintiff. The lower court sustained appellee's demurrer to this contention as a defense, but allowed the plea to go to the jury in mitigation of damages. The Supreme Court said:

"The court below, entertaining the opinion that, as defendant had entered into this marriage contract, he is bound for its breach, although it might have been the duty of appellant, under the circumstances, to decline to execute it, sustained the demurrer to the defense. That the contract was unconditional, and the defendant being able, at the time the promise was made, to perform the contract, he must either execute it, or become responsible in damages for the breach. If such a contract as that of marriage is to be treated in the light of a mere bargain and exchange of chattels between parties competent to contract, then it seems to us there would be but little difficulty in sustaining the action of the court below; but if the agreement, when entered into, is to be treated as creating a status that forms the basis of our entire social system, and in which society has more interest in preserving its purity than the parties to the agreement, it must follow that the defense interposed to appellee's claim for damages

was, in law as morals, sufficient to prevent the recovery. Where the marriage contract is consummated, the parties taking each other for better, for worse, for richer, for poorer, and agreeing to cherish each other in sickness and in health, the fact that the social standing of the one party or the other, or their pecuniary condition, was not as represented, will afford no ground for relief; still, where there is a mere agreement to marry, there may be such a condition of one party or the other, as to health or bodily infirmity, arising subsequent to the agreement, as would authorize either party to decline to enter into the marriage relation; and to hold otherwise would be to place such a contract upon the same footing with sales of mere personal chattels. It is said by Mr. Bishop, in his work on Marriage and Divorce, that 'one after marriage cannot complain of an impediment known to him before; but, if he were ignorant of the existence of the defect, or of its incurable nature, though in himself, he may take advantage of it by suit of nullity. The marriage was a mistake; the ends intended by it cannot be answered.' 2 Bishop, Marriage and Divorce (5th Ed.) Sec. 581. The text books establish the doctrine that without sexual intercourse the ends of marriage —the procreation of children, and the pleasures or enjoyments of matrimony—cannot be attained. The first cause and reason of matrimony, says Ayliffe, 'ought to be the design of having offspring; so the second ought to be the avoiding of fornication. And the law recognizes these two as its principal ends, namely, a lawful indulgence of the passions, to prevent licentiousness; and the procreation of children, according to the evident design of Divine Providence.' 1 Bishop, Marriage and Divorce (5th Ed.) Sec. 322. It is not pretended, nor has it been so adjudged in any court, that a mere temporary disease, or such a change in the physical condition of a party to a marriage contract, after it has been entered into, and without his fault, as would render him less capable of discharging the duties growing out of the marital relation, would be sufficient to justify its breach; but when the party is afflicted with

bodily disease to such an extent as is dangerous to the lives of those with whom he comes in contact, and such as must, if he should marry, necessarily be communicated to his wife . . . and, through her, affect her offspring with the poison, connected with the fact that he was ignorant of the disease being upon him at the time he contracts to marry, he will be excused for the nonperformance of his undertaking. While the contract to marry is silent as to any condition, it must be implied that any subsequent change in the physical or mental condition of either party, without fault, so as to render it impossible, in the nature of things, to accomplish the object for which the marriage relation is brought about, will release the parties from the agreement. Impotency, insanity, or such a diseased condition of the body as would affect the offspring and endanger the life of the mother, if the contract was carried out, would certainly be within this rule. Any other doctrine would require the same construction to be given the agreement to marry that is given to contracts for the sale and delivery of personal property. Where the party can recover, it must be in damages for the breach, although impossible to perform it; in other words, it is urged that the woman must either have the husband or damages in his stead, if he is able to have the marriage ceremony performed. This is also the objection to the majority opinions rendered in the Court of Queen's Bench in the case of *Hall v. Wright*, El. Bl. & El. 745. We concur with the minority opinions in that case, that the contract of marriage is subject to implied conditions peculiar to itself. In that case, the defense was that, after the promise and before the breach, the defendant was afflicted with bleeding from the lungs, and by reason of the disease became incapable of marriage without great danger to his life, and therefore, unfit for the married state, of which the plaintiff had notice. After reviewing the authorities upon the question, Erle, J., said: 'The principle to be deduced from the cases seems to me to be that a contract to marry is assumed, in law, to be made for the purpose of mutual comfort, and is

voided, if by the act of God or the opposite party, the circumstances are so changed as to make intense misery, instead of mutual comfort, the probable result of performing the contract.' The majority opinion was rendered on the idea that disease was not such a state of health as made it improper for the defendant to marry, and, therefore, not impossible of performance; and, if a case like the one being considered had been presented, we doubt if any difference of opinion would have been expressed. Pollock and other text writers on contracts, in alluding to this opinion, say that it is so much against the tendency of the later cases that it is now of little or no authority beyond the point decided; but, if that opinion had been unanimous, although entitled to great weight, we would not be inclined to follow its reasoning, or concur in the conclusion reached."

Judge Pollock, in his work on Contracts (3rd Edition), page 546, said:

"In the early and very peculiar case of *Hall v. Wright*, the question, after some critical discussion of the pleadings, which it is needless to follow, came to this: 'Is it a term in an ordinary agreement to marry, that if a man from bodily disease cannot marry without danger to his life, and is unfit for marriage from the cause mentioned at the time appointed, he shall be excused from marrying then?' or, in other words: 'Is the continuance of health (that is, of such a state of health as makes it not improper to marry), an implied condition of the contract?' The Court of Exchequer Chamber decided by four to three that it is not, the Court of the Queen's Bench having been equally divided. The majority of the judges relied upon two reasons: that if a man could not marry without danger to his life, that did not show the performance of the contract to be impossible, but at most, highly imprudent; and that, at any rate, the contract could be so far performed as to give the woman the status and social position of a wife. It was not disputed that the contract was voidable at her option. 'The man, though he may be in a bad state

of health, may nevertheless perform his contract to marry the woman, and so give her the benefit of social position, so far as in his power, though he may be unable to fulfill all the obligations of the marriage state; and it rests with the woman to say whether she will enforce or renounce the contract.' As to the first of these reasons, the question is not whether there is or not an absolute impossibility, but what is the true meaning of the contract; and in this case the contract is of such a kind that one might expect the conditions and exceptions implied in strictly personal contracts to be extended rather than excluded. As to the second reason, it cannot be maintained, except against the common understanding of mankind and the general treatment of marriage by English law, that the acquisition of legal or social position by marriage is a principal or independent object of the contract. Unless it can be so considered, the reason cannot stand with the principle affirmed in *Geipel v. Smith,* (1872) L. R. 7 Q. B. 404, that when the main part of a contract has become impossible of performance by an accepted cause, it must be treated as having become impossible altogether. The decision itself can be reviewed only by a court of ultimate appeal, but it is so much against the tendency of the later cases that it is now of little or no authority beyond the point actually decided, which, for the obvious reasons indicated in some of the judgments, is not at all likely to recur.''

In the footnote on page 547, Pollock on Contracts (3rd Edition), it is said:

''In an action by a woman for breach of promise to marry, it is a defense either that the woman has physical defects making marriage improper which, if existing, were unknown to the defendant at the time the engagement was made, or that the defendant himself has such defects,'' citing *Goddard v. Westcott,* 82 Mich. 180; *Gring v. Lerch,* 112 Pa. St. 244; *Vierling v. Binder,* 113 Iowa 337; *Shackleford v. Hamilton,* 93 Ky. 80; *Gardner v. Arnett,* (Ky.) 50 S. W. 840;

*Trammell v. Vaughan,* 158 Mo. 214; *Allen v. Baker,* 86 N. C. 91; *Sanders v. Coleman,* 97 Va. 690.

In *Allen v. Baker,* 86 N. C. 91 (41 Am. Rep. 444), the defendant failed to fulfill a contract of marriage upon the ground that he was afflicted with a venereal disease which rendered him unfit for the marriage state. The court, in disposing of the case, said:

"However once doubted, it is now generally conceded that, if the performance of a contract be rendered impossible by the act of God alone, such fact will furnish a valid excuse, for its nonperformance; and such a stipulation will be understood to be an inherent part of every contract. It is likewise true that, whenever the main part of an executory contract becomes impossible of performance, from any cause beyond the power of the party to control, it will be treated as having become impossible *in toto.* Why should not the same principle apply to a contract, the fulfillment of which, owing to causes subsequently intervening and altogether independent of any default of the party, can only be productive of consequences disastrous to the parties themselves, and such as may entail misery upon others to come after them."

In discussing the case, reference was made to *Hall v. Wright,* hereinafter more fully referred to. The court said:

"In making that decision, the court treated a contract for marriage as they would any other contract, saying that, though in bad health, the man might, nevertheless, so far perform his contract as to marry the woman, and thus secure to her the status and social position of his wife, and endow her with a wife's interest in his estate; and, if unwilling to do this, he should compensate her in damages for his refusal. We confess that we are not satisfied with this course of reasoning. In the first place, it is not possible to assimilate a contract like this to an ordinary contract for personal services, which, if not capable of being wholly performed, may be partially so; and, in the next place, we believe it to be con-

trary to the understanding of men generally, that the acquisition of property or social position either does or should constitute a main and independent motive and inducement for entering into such a contract. The usual, and we may say legitimate, objects sought to be attained by such agreements to marry, are the comforts of association, the *consortium vitae* . . . ; the gratification of the natural passions rendered lawful by the union of the parties; and the procreation of children. And if either party should thereafter become, by the act of God and without fault on his own part, unfit for such a relation and incapable of performing the duties incident thereto, then the law will excuse a non-compliance with the promise—the main part of the contract having become impossible of performance, the whole will be considered to be so. In Pollock on Contracts, 370 (a book in which the principles of contracts are treated more philosophically than by any author known to us), the decision of *Hall v. Wright, supra,* is referred to, with the remark that it is so much against the tendency of the later cases as to be now of little or no authority."

This case then proceeds to discuss the effect upon the woman and her offspring of consummating such a marriage, because that was the strongest argument to be urged against the consummation of the marriage. We think, however, it is not the only argument.

In *Boast v. Firth,* 4 Law Reports (C. P.) page 1, a master sued the father of his apprentice on his covenants in an apprentice deed, in which it was provided that the apprentice should serve him (the plaintiff), during all the term. The defense was that the apprentice was prevented from so doing by permanent illness arising after the making of the indenture. The court held that it must be held to have been in the contemplation of the parties, when they entered into this covenant, that the prevention of the performance by the act of God should be an excuse for nonperformance, and the defense was held good. The court, however, was cited to the

case of *Hall v. Wright,* as supporting the contention that
there should be liability, notwithstanding the illness of the
apprentice. The court said:

"It seems to me, however, that that case is clearly dis-
tinguishable. In the case of a contract to marry, the man,
though he may be in a bad state of health, may nevertheless
perform his contract to marry the woman, and so give her
the benefit of social position so far as in his power, though he
may be unable to fulfill all the obligations of the marriage
state; and it rests with the woman to say whether she will
enforce or renounce the contract."

*Robinson v. Davison,* Law Rep., Vol. 6, Ex. 269, involved
a contract to perform services which no deputy could perform
(the defendant was an eminent pianoforte player), and which,
in case of death, could not be performed by the executors of
the deceased. It was held that, by virtue of the terms of the
contract, incapacity either of body or mind in the performer,
without default on his or her part, is an excuse for nonper-
formance; and it seems to be the general holding that, where
one is engaged to perform services which he alone can per-
form, if, by the act of God, he becomes disabled for the per-
formance, he is excusable without damages.

See *Dickey v. Linscott,* 20 Me. 453; *Spalding v. Rosa,* 71
N. Y. 40; *Fenton v. Clark,* 11 Vt. 557; *Green v. Gilbert,* 21
Wis. 401.

This brings us to the only two causes to which our atten-
tion has been called holding that sickness does not excuse a
refusal to perform a marriage contract. The first is *Hall v.
Wright,* decided in 1858. This case was first heard in the
Court of Queen's Bench. In that court, the judges were four
to three against defendant's contention. The Court of Ex-
chequer Chamber on appeal held against such defense by a
vote of three, each judge filing an opinion in support of his
contention; thus holding that it was necessary to show, in
order to escape damages, that the performance of the contract
was impossible, and that, at any rate, the contract should be

so performed as to give the woman the status and social position of the wife, no matter what the condition of the defendant is at that time, provided he is capable of sitting up long enough to have the marriage ceremony performed.

Judge Willes, speaking as a member of the court, said:

"The contract in this case is stated by the plaintiff and admitted by the defendant, to have been in terms an unconditional one. . . . Its performance is not impossible, and it is not enough to show, in answer to an action upon a contract, that its performance is inconvenient or may be dangerous. The delicacy of health, alleged as an excuse, is the man's misfortune, not to be visited, beyond what is inevitable, upon the woman. If either party is to have the option of breaking off the match, it ought to be the woman. . . . If the man were rich or distinguished, and the woman mercenary or ambitious, she might still desire to marry him for advancement in life. I do not sympathize with such a woman, . . . but this is not a question of sentiment. If it were, I might put the case of a real attachment, where such an illness as that stated in the plea supervening might make the woman even more anxious to marry, in order to be the companion and the nurse, if she could not be the mistress, of her sweetheart."

Judge Crowder said:

"It is quite impossible to construe the plea as alleging any physical impossibility to go through the ceremony of marriage, or any physical incapacity to perform the duties of marriage. Whether, if such allegations had existed, they would have afforded any answer to the action, I do not think it is necessary in this case to decide. . . . But I am of opinion that it is no excuse for the breach of a promise to marry, that the performance of the conjugal duties would be attended with danger to the defendant's life."

Erle, Judge, speaking for himself, said:

"The plea alleges that, before any breach of the promise, the defendant was afflicted with a dangerous bodily disease,

which had occasioned frequent and severe bleedings from the lungs, and by reason thereof, defendant was incapable of marriage without great danger to his life. . . . The plaintiff contends that a contract to marry is not subject to implied conditions peculiar to itself . . . ; and that, when the time is come, the woman has a right either to a husband or to damages in lieu thereof; and that the fatal consequence of the marriage to the husband is either immaterial to the wife, or a ground for greater damages; as a widow may get more of her former husband's assets than a wife. But there is no authority to support this view; and there seems to me to be much reason and authority against it. A contract to marry has some peculiar incidents arising from its nature. . . . The principle to be deduced from these cases seems to me to be that a contract to marry is assumed in law to be made for the purpose of mutual comfort, and is avoided if, by the act of God or the opposite party, the circumstances are so changed as to make intense misery, instead of mutual comfort, the probable result of performing the contract. . . . The near approach of death by a fatal disease precludes any hope of personal comfort from cohabitation; and, if death is knowingly hastened thereby, each party, by performing the contract, might incur the criminal guilt of intentionally causing death.''

Judge Pollock said:

''Some learned judges think it (a contract to marry) is of the same character as any other contract, and that no terms or conditions can be implied by the law; and that, if it be not performed in the terms expressed, the party failing to perform it must pay damages for the breach of it. Other learned judges think that there are implied conditions or exceptions, and that the matter stated in the plea is one of them; and, therefore, that the defendant cannot be called upon to pay damages for the nonperformance of the contract, . . . under the circumstances which appear on the whole record. It must be conceded . . . that there are contracts

to which the law implies exceptions and conditions which are not expressed. All contracts for personal services which can be performed only during the lifetime of the party contracting are subject to the implied condition that he shall be alive to perform them."

Judge Pollock further said:

"I prefer putting my judgment on the ground that there is an implied exception in a contract of marriage, including the state of facts alleged in the plea. . . . The question then is: Is the continuance of health, of such a state of health as makes it not improper to marry, another condition? I am of opinion that it is. There are conditions to be implied (I think) on both sides in such an agreement. . . . By the act of God, the contract has become void. . . . It has been suggested that in such a case the woman may be contented with the society of the man, and that the choice ought to rest with her; that if she be willing to marry, he must marry or pay damages. . . . I think, if the man can say with truth, 'By the visitation of Providence, I am not capable of marriage,' he cannot be called upon to marry, and I think this is an implied condition in all agreements to marry. I think that a view of the law which puts a contract of marriage on the same footing as a bargain for a horse, or a bale of goods, is not in accordance with the general feelings of mankind, and is supported by no authority."

Our attention is called to what is said in Addison on Contracts, the great English authority (11th Edition), Chapter 7, Book 2, page 1315, as follows:

"If, subsequently to the making of a contract to marry, one of the parties by bodily disease becomes unfit for the performance of the most important duty of marriage, the party so unfitted is not thereby entitled to treat the contract as dissolved, the other party still desiring its performance. But the latter may break off the engagement; for, if a man, by disease, accident, or mutilation, becomes impotent, he could

never maintain an action against a woman for refusing to marry him.''

The only authority cited in support of the text is *Hall v. Wright, supra,* and the statement is practically taken from that case, and adds nothing to the holding of the English court.

Our attention has been called to *Smith v. Compton,* Court of Errors and Appeals, New Jersey, decided June 16, 1902, and reported in 52 Atlantic, page 386. That court said:

''The case of *Sanders v. Coleman,* (Va.) 34 S. E. 621 (47 L. R. A. 581), is more liberal to the defendant, and lays down the rule that where the defendant, after the promise, contracts or develops a disease, without fault on his part, which renders it unsafe and dangerous to his health or life to perform his contract, it will constitute a defense to an action against him. On the contrary, *Hall v. Wright,* 96 E. C. L. 746, maintains that such physical defects cannot be set up in bar to the action. In the case under consideration, the declaration alleges that the promise made was to marry on the 15th day of June, 1900, and both the plaintiff and defendant admit that such was the promise. . . . The promise being admitted, and the refusal to perform at the stipulated time being also admitted, the plaintiff clearly established her right of action. In the case of *Hall v. Wright,* the promise counted upon being to marry within a reasonable time, it might with some plausibility be argued that the defendant's physical condition might be considered in determining whether a reasonable time had elapsed, and, if it had not, there would be no breach proven, and the right of action would not exist.''

The court further proceeded:

''This is not a duty or a charge created by law, which the party is disabled to perform without any fault on his own part, but a contract entered into by himself, in which he might have provided against the contingency which he alleges has occurred. The contract is an unconditional one, into which

the defendant cannot read a condition which will defeat it. I agree with the declaration of the majority of the judges in *Hall v. Wright,* that it is not enough to show, in answer to an action upon the contract, after breach, that its performance is inconvenient or may be dangerous. Impossibility to perform will alone constitute an absolute bar. Ill health is the defendant's misfortune, not to be visited, beyond what is inevitable, upon the plaintiff. If the plaintiff was willing, in view of his social position, or that which she might acquire by reason of his wealth, to marry him, and await his restoration to health, she had the right to insist upon the benefit of the unconditional contract. If he was apprehensive of danger to his health or life, he could break the engagement, but was subject to such damages as a jury would award against him for the breach. That would, in effect, be a substituted performance in discharge of the obligation incurred. This is in consonance with the well-established rule which governs contracts, and, unless it is adhered to, the loss falls upon the party to whom no fault can be imputed. There was no error in the charge of the court.''

The instruction which the Supreme Court approved, so far as this case is concerned, is substantially as follows:

''Nothing will excuse the defendant for a breach of his promise, except such a disease, or complication of diseases, as renders the making of the marriage contract and the consummation of the marriage by marital intercourse, impossible.''

These are all the authorities, pro and con, to which our attention has been called, or which we are able to discover upon our individual research.

In the case at bar, the doctors testified that the defendant was affected with pernicious anemia; that one survives this disease usually but two or three months, possibly not more than a year; that, usually, a year is the limit; that defendant had become afflicted with the disease in February, 1910, at least that was the first time it was discovered that he was so afflicted. If the doctor's testimony is to be relied upon (and

there is no evidence to the contrary), it appears that he then had but ten months to live. There is no evidence that he broke his promise of marriage. The plaintiff testifies that he told her in 1910, and after her return in April, 1910, from a visit, that he had been to see a doctor and the doctor told him he could not live; that it was after that that he told her that he could not marry. There is no evidence that the promise was made after he discovered his condition. There is no evidence that he sought to avoid the contract until after it was found that he was stricken with a fatal malady, and that he could not live, by reason of his disease, more than a few months at most. There was no definite time fixed for the performance of the marriage, so far as this record discloses. If the malady had proven fatal before he had informed the plaintiff that he was unable to marry her because of his diseased condition, clearly plaintiff would have no cause of action under any of the authorities. Death would have dissolved the contract. There is in every contract of marriage the implied condition that the parties to the contract will be alive at the time appointed for its consummation.

The consideration for every agreement to marry is found in the consummation of that agreement by marriage. Each has bargained to give and receive, on that day, all that is implied in the marriage relationship—all that grows out of the marriage relationship. If, by the act of God, before the time fixed for the consummation of the marriage, either party is rendered incapable of giving that which the contract calls for, the other party may repudiate the agreement to marry, because of the failure, through the act of God, of the very consideration upon which the promise rests. It may be that the very condition that renders him incapable of giving, renders him wholly incapable of receiving any of the consideration, which, under the consummated contract, he is entitled to. The giving and receiving are mutual obligations. One is a condition for the other. If the woman may repudiate the contract because the man has become, by the act of God, in such a condi-

tion physically as to render him incapable of giving her all that, under the consummated contract, she is entitled to, then the man may, the contract being mutual, refuse to perform when, by the act of God, he has become wholly incapable of receiving any of the consideration to which the consummated contract entitles him. One cannot give to another that which the other is wholly incapable of receiving. We would hold, rather, that the consideration for the original agreement to marry has been destroyed by the act of God, and that what is claimed to be a repudiation of the contract, is simply a communication to the opposite party of the happening of an implied condition in the original contract, which rendered the contract incapable of performance.

Take an extreme case: Two people have entered into a contract to marry on a certain day. All the arrangements are made for marriage on that day. On the day before that fixed for the consummation, the man is afflicted with a mortal wound, or is overcome by a fatal malady. It becomes apparent from the conditions that he can live but a few hours or days. The woman appears at his bedside on the day fixed for the marriage and demands its consummation. Under the rule in *Hall v. Wright,* he must perform, if able to sit up and go through the ceremony and consummate the marriage; and this, that she may receive some of the benefits of the contract, although he is totally incapable of receiving anything in return. If he failed to respond to her request, his estate is mulcted in damages, though he died within two hours after the demand.

Reversing the tables, we take the case of a man in the full vigor and strength of his manhood, promising to marry a wealthy widow, vigorous and strong at the time of the promise, who, on the day fixed for the marriage, is stricken with a fatal malady from which there is no hope of recovery. There is left her but a few days or weeks in which to live. On the day fixed, he appears and demands the consummation of the marriage. She tells him she is unable to marry

because of her fatal malady.  However, she is able, at the
particular time, to go through the form and ceremony of
marriage, though in it is involved great peril to her life.  She
refuses to consummate, and her estate becomes liable to him
in damages.  If consummated, he is placed in a position to
receive a large portion of her estate.  She receives nothing in
the consummation of the marriage but the hollow mockery of
an empty ceremony.  If the rule in the *Wright* case is adopted
out of a chivalrous regard for the woman, it is thus seen that
it may fail in its application.

This, we think, is the logical effect of the full application
of the doctrine in *Hall v. Wright,* as followed by the New
Jersey Court of Appeals.  We are not inclined to follow
these authorities.

We take from these authorities, based, as we think, on
sound reasoning:

First, that one may repudiate an agreement to marry,
when, subsequently to the making of the contract, he becomes
afflicted with a loathsome disease, which, upon the consum-
mation of the marriage, may be communicated to the spouse
and to the offspring born of said marriage.

Second, when, after the making of the contract to marry,
he becomes afflicted with a fatal and incurable malady, and
the consummation of the marriage would hasten his death, he
is not bound to perform by consummating the marriage, and
therefore is not liable in damages for such failure.  Or, in
other words, that there is implied in every contract to marry
that the parties will not endanger life or health in the con-
summation of the marriage; and that, where illness or disease
comes upon one after making the contract to marry, such as
would render marriage dangerous to his life, a breach of the
contract, based on such unavoidable and such unanticipated
condition, is excusable.  We do not mean by this that the
danger should be simply problematical, or a possible con-
tingency—one that may or may not be a resultant conse-

quence of the act of consummating the marriage—but one which the evidence renders reasonably certain is the inevitable consequence of such an act. Where the malady is of such a fatal character that he cannot enter into the marriage relation and receive any of the benefits which grow out of and are involved in the relationship established by the consummation of the marriage, he is excused.

Third, that, where one is stricken, before the time arrives for the consummation of the marriage, with a fatal malady, and has but a few days or weeks or months to live, and the evidence makes this reasonably certain, he is excused from the consummation of the marriage, and, being excused, his estate, upon his death, is not liable in damages for such failure.

These are implied conditions in the agreement to marry, and the agreement to marry is voided by their happening, and, the agreement being void, no liability for damages results from the failure to perform. The first proposition rests upon public policy, as well as upon the conditions herein suggested.

In the instant case, the evidence discloses without question that, before any time was fixed for the final consummation of this agreement to marry, the defendant was afflicted with a fatal malady—a knowledge of which came to him before any suggestion was made by him to the plaintiff of any disposition on his part to withdraw from the performance of the contract and the consummation of it by marriage; that the malady was of a progressive character; and that he died soon after his conversation with the plaintiff in which she claims he breached his promise to consummate the marriage. Under the facts in this case, we are satisfied that the plaintiff has not shown a right to recover for the alleged breach of promise of marriage, and, on this issue, the case must also be affirmed. —*Affirmed* on both appeals.

DEEMER, LADD, WEAVER and PRESTON, JJ., concur.

EVANS, C. J., SALINGER, J., dissent as to Division II.

SALINGER, J. (dissenting).—While being afflicted with a loathsome venereal disease is suffered to be a complete defense to breach of promise, it has been understood always that this rests on a narrow exception engrafted upon the law of contracts; understood that such exception is not worked by tenderness to the defendant, but by reasoning that it will be a less evil to permit him to take advantage of his own wrong than to press him into a marriage which will offend public policy. The majority has extended the exception to what is not within the reason for the extension—to pernicious anemia, which, while surely fatal, and usually so within a year, is neither infectious, contagious nor transmissible. This exception is not enlarged on considerations of public policy, but on the ground that, if performance of a contract will be injurious to one party to it, neither performance nor damages may be exacted of him. In my opinion, this violates both reason and authority. *Cessante ratione legis, cessat ipse lex,* is disregarded. It, therefore, is not surprising that the opinion of the majority proves to be much more a strenuous effort to find reasons for a desired conclusion than the statement of a conclusion compelled by reasoning.

In Broom's Legal Maxims (7th Ed.), *page 251, it is said:

"To a declaration for breach of promise of marriage, a plea that after the promise, and before breach, the defendant became afflicted with disease, which rendered him 'incapable of marriage without great danger of his life and, therefore, unfit for the married state' was recently held bad, in accordance with the general rule that a man who has voluntarily contracted shall either perform his contract or pay damages for breach of it, the plea, moreover, not showing an impossibility of performance."

Addison on Contracts, the great English authority, at page 1315 (11th Ed.), says:

"If, subsequently to the making of a contract to marry, one of the parties by bodily disease becomes unfit for the per-

formance of the most important duty of marriage, the party
so unfitted is not thereby entitled to treat the contract as
dissolved, the other party still desiring its performance. But
the latter may break off the engagement; for if a man, by
disease or mutilation, becomes impotent, he could never main-
tain an action against a woman for refusing to marry him.''

For this, he cites *Hall v. Wright*, El. Bl. & El. 746, de-
cided in Exchequer Chamber, reversing a contrary decision
below. This case fully sustains the text. In it, the following
plea was held to present no defense:

"*That defendant after the promise and before the breach,
became afflicted with disease occasioning bleeding from the
lungs, and by reason of such disease became incapable of
marriage without great danger to his life, and, therefore, un-
fit for the marriage state.*"

Willes, J., in speaking of the contract, said:

''Its performance is not impossible; and it is not enough
to show, in answer to an action upon a contract, that its per-
formance is inconvenient or may be dangerous. The delicacy
of health, alleged as an excuse, is the man's misfortune, not to
be visited, beyond what is inevitable, upon the woman. If
either party is to have the option of breaking off the match,
it ought to be the woman. The court has no right to say
what is best for her. If the man were rich or distinguished,
and the woman mercenary or ambitious, she might still desire
to marry him for advancement in life. I do not sympathize
with such a woman, if any there be, but this is not a question
of sentiment. If it were, I might put the case of a real attach-
ment, where such an illness as that stated in the plea super-
vening might make the woman even more anxious to marry,
in order to be the companion and the nurse, if she could not
be the mistress, of her sweetheart.''

Crowder, J., said:

''But I am of opinion that it is no excuse for a breach
of promise to marry, that the performance of the conjugal

duties would be attended with danger to the defendant's life. Such a state of illness may make it matter of the greatest prudence on his part to break his contract, and to pay such damages as a jury may award against him for the breach. But, in my opinion, it is no legal answer to the action.''

*Boast v. Firth,* relied on by the majority, so far from sustaining the opinion, is affirmatively against it. It says (4 L. R. 4 C. P. [1868], at page 8) :

''In the case of a contract to marry, the man, though he may be in a bad state of health, may, nevertheless, perform his contract to marry the woman, and so give her the benefit of social position so far as in his power, though he may be unable to fulfill all the obligations of the marriage state; and it rests with the woman to say whether she will enforce or renounce the contract.''

*Hall's* case was expressly approved in *Smith v. Compton,* (N. J.) 52 Atl. 386. There the contention was that defendant had a complete defense because, without his fault, he, after promise, contracted or developed a urinary disease which kept him under treatment, and which would be aggravated by sexual intercourse and thus be an imminent hazard to his life.

On appeal, Justice Van Syckle said:

''I agree with the declaration of the majority of the judges in *Hall v. Wright,* that it is not enough to show in answer to an action upon the contract, after breach, that its performance is inconvenient or may be dangerous. Impossibility to perform will alone constitute an absolute bar. Ill health is the defendant's misfortune, not to be visited, beyond what is inevitable, upon the plaintiff. If the plaintiff was willing, in view of his social position, or that which she might acquire by reason of his wealth, to marry him, and await his restoration to health, she had the right to insist upon the benefit of the unconditional contract. If he was apprehensive

of danger to his health or life, he could break the engagement, but was subject to such damages as a jury would award against him for the breach. That would, in effect, be a substituted performance in discharge of the obligation incurred. This is in consonance with the well-established rule which governs contracts, and, unless it is adhered to, the loss falls upon the party to whom no fault can be imputed.''

The majority attempts to avoid these direct and palpably sound authorities by stating that the tendency of the ''later cases'' is against *Hall v. Wright*. The ''later cases'' consist of the *one case* of *Sanders v. Coleman*, (Va.) 34 S. E. 621, in which, on identical plea of urinary disease, a conclusion opposite to that of *Smith v. Compton, supra*, is reached.

It is sufficient comment upon the *Sanders* case that its only citations are the *Shackleford* case and the *Allen* case.

As to *Shackleford v. Hamilton*, (Ky.) 15 L. R. A. (O. S.) 531, it is the fact, and the opinion itself shows it to be the fact, that it was decided wholly on the ground that the marriage of a syphilitic might have such consequences as that public policy will permit that that disease be urged as a complete bar to a promise to marry. While it, in a way, approves a statement in a dissent by Erle, J., in *Hall v. Wright, supra*, an examination will show that even this much, which is said merely *arguendo*, deals with the rights of *the party not breaching*.

While *Allen v. Baker*, 86 N. C. 91, has an abundance of rhetoric and language which, if broadly accepted, makes any disease a complete defense, it suffices to say that it, too, involves ''a loathsome disease, incurable in fact, and of such a nature as to render him unfit to enter the marriage relation with anyone;'' and that its ultimate conclusion is:

''We cannot understand how one can be liable for not fulfilling a contract when the very performance thereof would in itself amount to a great crime, not only against the individual, but against society itself.''

2.

The "support" of the *Sanders* case which the majority marshals, is remarkable. The *Shackleford* and *Allen* cases have been discussed. *Grover v. Zook,* (Wash.) 87 Pac. 638, which the majority thinks supports the *Sanders* case, cites the *Shackleford* case. The *Zook* case itself is decided wholly upon the ground that consumption is a complete defense because it is highly infectious and transmissible, and the ruling, once more, is put wholly upon the grounds of public policy. The only support it affords to the claim of the majority that aggravation of a disease which defendant has would justify his breach of promise is the remark that, "in addition to the thought of progeniture, there would be also that of the aggravation of the disease as to both himself and prospective wife, the medical experts showing that the intimate association of married life would tend to augment the ravages of the malady upon each." To make plain that this is merely incidental argument instead of the decision in the case, it is only necessary to examine the citations, which are *Ryder v. Ryder,* (Vt.) 28 Atl. 1029; *Atchinson v. Baker,* 2 Peake 103, and *Trammell v. Vaughan,* (Mo.) 59 S. W. 79—which last case, the majority relies on affirmatively. It holds that discovery that defendant was afflicted with contagious venereal disease entitled him to postpone the marriage for a reasonable time, whether or not plaintiff, with knowledge of his condition, was willing for the marriage to take place.

*Beans v. Denny,* 141 Iowa 52, involves the rights of the party *who is not diseased,* and the nearest it comes to touching the case at bar is in its statement that one is excusable for declining to carry out the promise of marriage where the other party is afflicted with an incurable venereal disease, unless the promise was made with knowledge that the other party had such disease. The other cases relied on by the majority are the following, and seem to be utterly irrelevant:

*Vierling v. Binder*, 113 Iowa 339, is that where the defendant pleads he did not engage to marry because of physical condition of the *plaintiff at the time when it is claimed he did make such engagement*, he cannot show that she had these ailments *at the time of the trial of her action for breach*. *Gring v. Lerch*, 112 Pa. St. 244, holds it to be a valid defense to the action that the *woman* was unable to have sexual intercourse, and, although she promised to submit to a surgical operation to cure the difficulty, refused to do so. All that is decided by *Goddard v. Westcott*, (Mich.) 46 N. W. 242, is that *plaintiff* may be asked, on cross-examination, whether she had told certain persons she had a tumor, for the purpose of showing that she was not capable of making or carrying out the contract at the time inquired into, without fraud or injury to the defendant.

### 3.

It seems to have been apprehended that the weight of direct case law is not with the opinion, and a labored attempt is made to fortify it with "Act of God" law, and the general principles that govern mutuality of contract and failure of consideration. To make use of the act of God cases, the majority is obliged to assume certain facts erroneously, to make unsound deductions from what is assumed, and to misapprehend what "Act of God" is, in law. To make this plain, one need but point out that the opinion inquires whether death before breach would not be a complete defense, and answers that it would. This is true, but true because all the cases hold that that only is an act of God which makes any performance impossible. Death does that. As to the cases upon which the opinion relies—*Robinson v. Davison*, Law Reports, Vol. 6, Ex. 269, and the cases therein cited (and cited also by the majority), to wit: *Dickey v. Linscott*, 20 Me. 453; *Fenton v. Clark*, 11 Vt. 557, *Spalding v. Rosa*, 71 N. Y. 40, and *Green v. Gilbert*, 21 Wis. 401—each and all of them in some form or other involve the proposition that, if one agree to perform

personal labor or services which cannot be done by deputy, and become too ill to perform, he is excused.   Certainly. Where one agrees to do labor and, without fault of his, sickness makes it *impossible* for him to labor, there is a case which is in principle the equal of death.   The law on this head is in no confusion.   *Dewey v. Union School District,* (Mich.) 5 N. W. 646, 647, and *Gear v. Gray,* (Ind. Appellate) 37 N. E. 1059, declare that the performance of a contract will only be excused as being prevented by the ''Act of God'' when there are intervening circumstances which render performance impossible, and not when they only make it difficult and undesirable; and hence the suspension of a school by reason of an epidemic of a contagious disease does not defeat the right of a teacher to compensation under his contract.

In *Ringeman v. State,* (Ala.) 34 So. 351, sureties on a bail bond pleaded on a judgment *nisi* that, after the execution, the principal was so ill of consumption that it became necessary to the preservation or prolongation of his life for him to go to another state; and that, at the time a forfeiture was taken, a return could not have been made without serious detriment to his health, nor without imminent danger to his life.   It was held a bad plea because it did not aver impossibility of appearance by the principal resulting from an act of God; and that, while his death in such case would have been the act of God in legal contemplation, illness, however severe and critical, is not.   In support, the case cites *Cain v. State,* 55 Ala. 170; *State v. Crosby,* (Ala.) 22 So. 110; 3 Am. & Eng. Encyc. of Law 717; *Taylor v. Taintor,* 16 Wall. 366; *Piercy v. The People,* 10 Ill. App. 219; *Devine v. State,* 5 Sneed (Tenn.) 623, and *Scully v. Kirkpatrick,* (Pa.) 21 Am. Reports 62, 64.

Not a case may be found in which *vis major* is applied to anything short of utter inability to perform, at all.   That it may not be in the very case at bar is squarely held in Broom's Legal Maxims, Addison's Contracts, Pollock's Contracts, and *Boast v. Firth,* relied on by the majority, and in *Hall v.*

*Wright,* and *Smith v. Compton.* These demonstrate that ''Act of God'' has no application where performance is not rendered impossible. To avoid them the majority is forced to reason thus: (1) Act of God is a complete defense because it makes any performance impossible; (2) a fatal disease is an act of God; (3) defendant had such disease; (4) *therefore,* it was *impossible* for him to marry, and he is excused.

It is manifest, the opinion was compelled to assume that his disease made performance by defendant *impossible.* This assumption counters the testimony adduced for defendant, including Dr. Patty, who said: ''I do not mean to say he was unable to stand up and go through a ceremony of marriage.'' It assumes what is contrary to reason and common knowledge, and is against all the authorities that speak to the point, including those upon which the majority relies. See the authorities last referred to. It cannot be conceived how the mere going through the ceremony can have such or much effect on health or life—or though one be in never so parlous a state of health why he is incapable of becoming married.

The majority inquires whether, in the extreme case of a demand for performance, when the other party is immediately to die, and the ceremony involves ''in it great peril to life,'' there should be a recovery. It *is* an extreme case, and the question might well be answered by asking whether, if death be certain, though a year away, performance would be excused; for the two cases involve nothing but a difference in degree. But even as to the extreme case suggested, it can be said, in the first place, that the going through the ceremony cannot involve great or any other peril to life; that cases do occur in which the man, though mortally wounded and about to expire, has insisted upon giving his name and the right of inheritance to the woman whom he had promised to marry; and that the situation presents no more than matter in mitigation. In such circumstances, the recovery would not be large, but that is no good reason for departing from the sound rules of the law of contracts. Better that recovery should be allow-

able in any case than to disturb salutary elementary rules which prohibit a breach of contract based on the desires or convenience of the one repudiating.

## 4.

Realizing, no doubt, the weakness of argument based on the "impossibility" or injuriousness of going through the ceremony, it is insisted that marriage means more than being one party to the marriage service, and that marriage is "impossible" whenever one party is unable to respond to all that marriage means or should mean. This reasoning can be supported only by the application of general rules governing mutuality in contracts, or by assuming that the rearing of children is of itself the consummation of marriage, and its sole constituent. This last overlooks consortium, the privilege of bearing the name of the man, of being endowed with his social standing, and of the right of inheritance. Followed to the bitter end, any who are above a certain age may freely breach a contract to marry because there could be no off-spring from their marriage. As the opinion itself shows, Pollock declares that impossibility of performance as applied to breach of contract to labor by reason of sickness has no place here, because to apply it would be "against the common understanding of mankind, and the general treatment of marriage by English law according to which the acquisition of legal or social position by marriage is a principal or independent object of the contract," and (Contracts, 3rd Ed., page 546) though defendant may be unable to fulfill all the obligations of the marriage, it rests with the woman to say whether she will enforce or renounce the contract—all of which amounts to saying that there is no impossibility of performance, as the law understands the term, merely because children are impossible. In *Boast v. Firth*, relied on by the majority, it is said that the contract to marry may be performed despite bad health, because the sick man can "give

her the benefit of social position so far as in his power, though he may be unable to fulfill all the obligations of the marriage state." In *Grover v. Zook,* also relied on by the majority, "the thought of progeniture" is treated as but one element, and the defendant is excused, not on that account, but because his pulmonary consumption made the marriage one against public policy. It has already been presented by the illustration of an agreement to marry entered into by very old people, and by death-bed marriages insisted upon by the one dying, that marriage on part of one who is mortally ill is not impossible, and that marriage involves more than children.

5.

The theory of failure of consideration is not persuasive, either. This is the first time it has been invoked *for the one who is unable to furnish full consideration.* It involves a confusion of the parties. The woman might well refuse to marry because the condition of the man was such that his marrying her would furnish no consideration for her promise to marry him. Reversing this leads to the remarkable result that one who has agreed to furnish certain things, and is unable to furnish them, or some of them, may plead a failure of consideration, and say that, because he can furnish only half of what was agreed upon, that then, though the other party is satisfied with half, he need not perform at all, because he cannot furnish all. Such reasoning overlooks that where there may be a part performance, and the one able to perform fully is willing to waive full performance by the other, it does not lie in the mouth of the one who is in default to complain. Take the illness cases before adverted to. There would be a wholly different ruling if one agreed to do copying in an office and also to sweep the office, and it transpired he was too ill to do the sweeping, but able to do the copying, and the employer was willing to accept copying as full performance of the contract. The employer might well

refuse to perform if the other could not do all that was contracted for. But the opinion turns this round, and excuses one from doing what he can do, because it is less than he agreed to do, even though the other party is willing to accept the shortage.

*Boast v. Firth, supra,* involves inability to perform labor agreed to be performed, because of permanent sickness, and holds such illness to be an excuse; but it distinguishes *Hall v. Wright, supra,* by pointing out that, while the apprentice in the *Boast* case could not perform, on contract to marry, the man, though he may be in a bad state of health, may perform to some extent, and he may not avail himself of his disability, if the woman is willing to accept part performance.

One can understand how, on the reasoning of the majority, a young woman who had agreed to marry an octogenarian might decline performance on the ground that there was no consideration for her promise; but it is beyond me to understand how the old man can interpose such plea to excuse performance on his part, when the other party remains willing.

"Where the malady is of such a fatal character that he cannot enter into the marriage relation and receive any of the benefits which grow out of and are involved in the relationship established by the consummation of the marriage, he is excused," says the majority. And, if "either party is rendered incapable of giving that which the contract calls for, the other party may repudiate the agreement . . . because of the failure . . . of the consideration upon which the promise rests." And, one may "refuse to perform when, by the act of God, he has become wholly incapable of receiving any of the consideration." Is the majority prepared to follow this where it may lead?

If one have spectacles fitted and immediately thereafter become blind, is he excused from paying for the work and the glasses because an act of God has made them of no use to him? Will the amputation of both feet after ordering boots absolve from payment? If one ordered lemons, and,

by the time they reached him in due course of transportation, he found himself suffering from some disease of the throat that would make it agony for him to use the lemon juice as he had intended, it would follow, on the reasoning of the majority, that he could refuse to pay.

### 6.

The majority says:

"If the woman may repudiate the contract because the man has become by the act of God in such a condition physically as to render him incapable of giving to her all that, under the consummated contract, she is entitled to, then the man may, the contract being mutual, refuse to perform when, by the act of God, he has become wholly incapable of receiving any of the consideration which the consummated contract entitled him to. One cannot give to another that which the other is wholly incapable of receiving."

This overlooks all that has just been said, and holds that, because one who has the right to repudiate chooses to waive that right, the other is thereby authorized to repudiate. So far as the doctrine of the mutuality of contracts is applicable, the cases do apply it. Either may defend on the ground that his or her disease is such that performance would violate public policy. To go beyond this is to apply one of the exceptional rules in specific performance to the case of this contract.

There is a rule in specific performance that one who was himself unable to perform when the contract was made cannot have this particular remedy, even though he becomes able to perform before he brings action. *Luse v. Deitz,* 46 Iowa 205; *Richmond v. Dubuque & S. C. Railway,* 33 Iowa, at 486. Self-evidently, this rule can have no application in any case where the court is without power to compel specific performance. A marriage is manifestly one of the things that may not be compelled by court order. Consequently, that one is not bound to marry a plaintiff who is sick does not make a

law rule that, where plaintiff is willing to marry a defendant, though sick, such defendant may break his contract because he is sick.

If one can conceive the inconceivable case of a promise to marry being brought into chancery on application for specific performance, then, the granting of the relief being discretionary, it might well be that, in a case where performance would entail physical danger to the party in default, the chancellor would use his discretion and relegate the one not in default to some remedy other than specific performance. But here, the essential position of the defendant is that, because it will work an injury to him and him alone,—because, if he kept his promise, the consortium he could give would be of less value than if he were well, therefore the party not in fault is entitled to no relief.

I would reverse on the appeal of defendant.

EVANS, Ch. J. (dissenting).—I am not averse in spirit to the condition imposed by the majority upon the marriage promise. Its reasonableness is that it softens harshness in the enforcement of a contract which, from its very nature, ought to be characterized by tenderness. However, to subject such contracts to such a condition as a continuing and necessary qualification thereof is to declare a measure of disability. This is a purely legislative prerogative, and not a judicial one. In the absence, therefore, of qualifying legislation, I feel constrained to join the dissent as declaring for the recognition of the contract as actually made by the parties.